William B. Sullivan [CSB No. 171637]
helen@sullivanlawgroupapc.com
Eric K. Yaeckel [CSB No. 274608]
yaeckel@sullivanlawgroupapc.com
**SULLIVAN & YAECKEL LAW GROUP, APC**
2330 Third Avenue
San Diego, California 92101
(619) 702-6760 * (619) 702-6761 FAX

Derik N. Lewis (SBN 219981)
**VANTIS LAW FIRM, APC**
120 Vantis, Ste 300
Aliso Viejo, California 92656
Telephone: (949) 216-0935
Facsimile: (949) 296-0935
DLewis@VantisLaw.com

Attorneys for Plaintiffs ALFONSO GUZMAN and BENITA GUZMAN

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALFONSO GUZMAN and BENITA GUZMAN, individually and on behalf of other members of the public similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> MR. COOPER GROUP INC., a Delaware corporation; NATIONSTAR MORTGAGE LLC; a Delaware Limited Liability Company; XOME INC., a Delaware Corporation; BARBARA LYNN SIMMONS, an individual; THOMAS HUGH O'LEARY, an individual; and DOES 1 through 50, Inclusive, | CASE NO: <br><br> **PLAINTIFFS' COMPLAINT FOR:** <br><br> 1. BREACH OF FIDUCIARY DUTY – NATIONWIDE CLASS <br> 2. BREACH OF FIDUCIARY DUTY – CALIFORNIA CLASS <br> 3. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY – CALIFORNIA CLASS <br> 4. NEGLIGENCE – NATIONWIDE CLASS <br> 5. NEGLIGENCE - CALIFORNIA CLASS <br> 6. INTENTIONAL MISREPRESENTATION – CALIFORNIA CLASS <br> 7. INTENTIONAL INTERFERENCE |

1

**CLASS ACTION COMPLAINT**

Defendants.

WITH CONTRACTUAL RELATIONS – CALIFORNIA CLASS

8. VIOLATIONS OF 12 U.S.C. § 2607 – NATIONWIDE CLASS

9. VIOLATIONS OF REGULATION X – NATIONWIDE CLASS

10. VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT – NATIONWIDE CLASS

11. VIOLATIONS OF THE CALIFORNIA ROSENTHAL ACT – CALIFORNIA CLASS

12. VIOLATIONS OF CALIFORNIA'S HOMEOWNER BILL OF RIGHTS – CALIFORNIA CLASS

13. UNFAIR PRACTICES UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ. – CALIFORNIA CLASS

14. RESCISSION – CALIFORNIA CLASS

15. DECLARATORY RELIEF – CALIFORNIA CLASS

(DEMAND FOR JURY TRIAL)

Plaintiffs ALFONSO GUZMAN and BENITA GUZMAN (**"Plaintiffs"**), individually and on behalf of other members of the general public similarly situated, bring this complaint against the above-named Defendants and DOES 1 through 50 inclusive, and each of them, and alleges as follows:

## THE PARTIES

1. Plaintiffs were at all times material hereto individuals residing in Riverside County, California. Plaintiffs owned the residential real property

commonly known as 1058 BRAMBLE WAY, SAN JACINTO, CALIFORNIA 92582 (the ***"Property"***) and at all relevant times occupied that property as Plaintiffs' principal residence. Venue before this Court is proper in that the wrongful acts which gave rise to Plaintiffs' injuries occurred in the County of Riverside, State of California.

2.    Plaintiffs are informed and believe, and thereon allege, that Defendant **MR. COOPER GROUP INC.** (***"COOPER"***) (previously known as WMIH Corp.), is a corporation duly organized and existing under the laws of the state of Delaware since May 11, 2015. On July 31, 2018, Wand Merger Corporation, a wholly owned subsidiary of WMIH Corp., merged with and into Nationstar Mortgage Holdings Inc. ("NMH"), with NMH continuing as a wholly owned subsidiary of WMIH Corp.

3.    Plaintiffs are informed and believe, and thereon allege, that Defendant **NATIONSTAR MORTGAGE LLC** which does business under the name "Mr. Cooper" (***"NATIONSTAR"***) is and at all times relevant herein was, a Delaware Limited Liability Company whose headquarters are located in the State of Texas, and at all times relevant herein was actively engaged in the business of making, arranging, holding and/or servicing loans in Riverside County, and throughout California and/or involving real properties located in Riverside County, and throughout California.

4.    Plaintiffs are informed and believe, and thereon allege, that NATIONSTAR services more than 5,000 consumer mortgages and conducted within the most recent regulatory reporting period, more than 175 foreclosures on residential real properties of four or fewer dwellings located in California.

5.    Plaintiffs are informed and believe, and thereon allege, that Defendant **XOME INC.** (***"XOME"***) (pronounced "zome") is and at all times relevant herein was, a Delaware Corporation whose headquarters are in the State of Texas, and at all times relevant herein was actively engaged in the business of listing, marketing, auctioning and selling residential real estate in Riverside County, and throughout

California, and/or involving real properties located in Riverside County and throughout California.

6.    Plaintiffs are informed and believe, and thereon allege, that XOME is a California licensed real estate brokage (DRE # 01932600) with a main office address of 2945 TOWNSGATE RD STE 200, WESTLAKE VILLAGE, CA 91361, and with designated broker/officers of Barbara Lynn Simmons (DRE # 00637579) and Thomas Hugh O'Leary (DRE # 01840925).

7.    Plaintiffs are informed and believe, and thereon allege, that NATIONSTAR and XOME are affiliated and directly related companies that share the same corporate address and have common ownership. Accordingly, Plaintiffs allege these companies at all times acted jointly and in concert with respect to the allegations in this Complaint.

8.    Plaintiffs are informed and believe, and based thereon allege, that Defendant **BARBARA LYNN SIMMONS** (DRE # 00637579) (***"SIMMONS"***) is, and at all times relevant herein was an individual licensed by the State of California as a real estate broker, acting as a "Broker/Officer" for XOME, and actively engaged in the business of facilitating the listing, marketing, selling and buying of real property in Riverside County, California and/or involving real properties located in Riverside County, California and with a principal place of business located in Riverside County, California.

9.    Plaintiffs are informed and believe, and based thereon allege, that Defendant **THOMAS HUGH O'LEARY** (DRE # 01840925) (***"O'LEARY"***) is, and at all times relevant herein was an individual licensed by the State of California as a real estate broker, acting as a "Broker/Officer" for XOME, and actively engaged in the business of facilitating the listing, marketing, selling and buying of real property in Riverside County, California and/or involving real properties located in Riverside County, California and with a principal place of business located in Riverside County, California.

10.     Plaintiff is informed and believes and thereon alleges that Defendants are subject to the terms of the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12, Chapter 27 of the United States Code, 12 U.S.C. §§ 2601–2617, as further set forth herein.

11.     RESPA specifically authorizes an action to be brought "in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred." 12 U.S.C.A. § 2614 (2001). Federal Question Jurisdiction is also proper for Plaintiff's RESPA claims based upon 28 U.S.C. § 1331.

12.     Plaintiffs are informed and believe and based thereon allege that Defendants conducted within the most recent regulatory reporting period, more than 175 foreclosures on residential real properties of four or fewer dwellings located in California.

13.     The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 50, inclusive, are unknown to Plaintiff at this time, and DOES 1 through 50 are therefore sued by such fictitious names. Plaintiff will, with leave of court if required, amend this complaint to set forth the true names and capacities of such fictitiously-named defendants when the same have been ascertained. Plaintiffs are informed and believe, and thereon allege, that each such fictitiously-named defendant is responsible in some manner for the acts and occurrences hereinafter alleged.

14.     Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, each of the Defendants, including the DOE Defendants, was the agent, servant, officer, representative, employee and/or alter-ego of each of the remaining Defendants and was at all times acting within the course and scope of such relationship, or was in some way the cause of Plaintiff's harm and injury.

15.     COOPER, NATIONSTAR, XOME, SIMMONS, and O'LEARY and DOES 1-50 are collectively referred to herein as ***DEFENDANTS.***

## **MORTGAGE SERVICING BACKGROUND**

16.    The residential mortgage market is the largest market for consumer financial products in the United States with over $10 trillion in loans outstanding. Mortgage servicers play a critical role in the mortgage market, manning the front lines in the day-to-day management of mortgage loans for banks, lenders and investors. The majority of mortgage loans serviced by mortgage servicers are owned by investors of securitized loans.

17.    Servicers are responsible for sending monthly mortgage statements, collecting and distributing mortgage payments, maintaining and disbursing funds from escrow accounts for payment of insurance and property taxes, reporting to creditors and investors, and interacting with borrowers regarding servicing questions and concerns.

18.    Servicers are also specifically responsible for administering collection efforts after a borrower default and for pursuing foreclosure, as well as overseeing and implementing loss mitigation programs and foreclosure preventions options to assist borrowers in avoiding default, delinquency and foreclosure.

19.    Mortgage servicing can be performed by banks or non-bank entities depending on the mortgage product and business model.  Some lenders make loans and conduct all the servicing on those loans.  Other lenders will sell their interest in the mortgage loans but retain the servicing rights to collect the fees as a servicing business.  In other cases, mortgage servicers have no role in loan origination or ownership at all and simply service mortgages for third-party lenders.  These third-party mortgage servicers are hired to either service mortgages in a lender's portfolio, or they can purchase the mortgage servicing rights on securitized loans.

20.    The rights of the mortgage servicer and the owner of the mortgage are contained in written servicing agreements between the parties.  These servicing contracts may specify the circumstances under which a mortgage servicer may offer loan modifications to borrowers.  However, these servicing contracts are subject to

state and federal laws, rules and regulations regarding mortgage servicing and loss mitigation processing.

21.     Compensation models for mortgage servicing may vary, but servicers generally recoup their investment in purchasing servicing rights and earn a profit through the following: (i) a net servicing fee, which is usually expressed as a constant rate assessed on unpaid mortgage balances; (ii) interest float on escrow accounts prior to disbursement; (iii) charging and collecting fees allowed under the mortgage documents or for administrative functions such as responding to borrower requests, and (iv) marketing other products and services to borrowers.

22.     Under this compensation model, servicers are effectively compensated for functioning as collectors and processors with little attention to customer service or borrower satisfaction.  Furthermore, borrowers have no ability to select or change servicers and therefore have little sway in the functions or service levels of these servicers.  Servicers simply compete for business by offering loan owners lower pricing on the servicing performed and, in doing so, reduce the available financial resources to allocate toward borrower satisfaction and regulatory compliance.

23.     Intensifying the divide between a servicer's motivation for profits and the borrower's desire for better service is the often-unknown fact that servicers earn additional revenue from various fees assessed on borrowers such as late fees and administrative functions like providing payoff statements, processing direct payments and other borrower-initiated services. Further, servicers can make significant profits from property preservation, inspection and foreclosure related activities. Some even make money from property transactions AFTER foreclosure is completed.  Therefore, servicers have an incentive to seek out opportunities to impose fees on the borrower and to delay or ignore loss mitigation rules, regulations and laws.

24.     The inherent conflicts of interest and extreme pressure related to higher volumes and lower pricing in the mortgage servicing industry came to a head when

the real estate market imploded in 2007-2008.  After the 2007-2008 global financial crisis, and during the resulting Great Recession, the number of mortgage defaults in the United States surged to historic levels.   Servicers were unable to handle the eruption of delinquent loans, mortgage modification requests, and foreclosures. Delinquency rates nearly doubled from 2007 to 2010 and servicers had inadequate procedures and infrastructure to handle the upturn.  Mortgage servicers were flooded with loss mitigation requests from struggling borrowers.

## LOSS MITIGATION DURING
## THE GREAT RECESSION

25.    A loss mitigation request is a plea for help from a borrower in financial difficulty who needs accommodation on his or her mortgage to avoid delinquency, default and/or foreclosure. Loss mitigation can take various forms ranging from temporary forbearance to more permanent changes in the interest rate, loan balance or length of repayment, all with the intent of allowing the borrower to retain ownership of their home.  In situations where the borrower is no longer able to afford the home, loss mitigation can still assist in avoiding a punishing foreclosure by pursuing a short sale or deed-in-lieu of foreclosure.

26.    During this time, servicers lacked the experience and manpower to adequately address the surge of mortgage defaults and resulting tsunami of loss mitigation requests.  The industry-wide deficiencies of mortgage servicers resulted in a number of enforcement actions by federal and state regulators. The failures in mortgage servicing led to various problems for borrowers. Borrowers were unable to obtain information about loss mitigation programs and foreclosure avoidance options.  Servicers were unable to process applications for loss mitigation in a timely manner and homeowners ended up in foreclosure and losing their homes by the thousands.  Many times, foreclosure proceedings were commenced without proper documentation and without adequate resources to administer the foreclosure process. Servicers also failed to sufficiently oversee third-parties handling foreclosure- related

services.

27.     Caving into the pressure to process more and more foreclosures, the nation's largest servicers instituted a practice now known as "Robo-signing" whereby servicers improperly had employees sign foreclosure filings en masse to speed up the processing without knowing if those documents were correct.   In February 2012, the federal government, 49 state attorneys general and the District of Columbia, entered into the largest consumer financial protection settlement in U.S. history with what were then the nation's five largest mortgage servicers.   This "National Mortgage Settlement" provided over $50 billion in relief to distressed borrowers harmed by the wrongful foreclosures and direct payments to the states and the federal government.   Similar settlements and consent orders with Federal regulators were later made with many other servicers.

28.     The Federal government also instituted programs like the Home Affordable Modification Program (HAMP), which provided eligible borrowers with an opportunity to modify their mortgage loans to make them more affordable. Servicers were eligible for incentive payments for participating in HAMP.

29.     Despite these enforcement actions and incentive programs, state and federal regulators were still concerned that the mortgage servicing industry was not adequately looking out for the rights of borrowers facing financial difficulties.

## REGULATION X OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

30.     The Real Estate Settlement Procedures Act of 1974 (***"RESPA"***) was originally enacted by Congress based on findings that reforms to the real estate settlement process were necessary to ensure that consumers were provided with greater information on the settlement process and to protect consumers against unwarranted settlement charges.   In 1990, the law was amended to cover persons responsible for servicing federally-related mortgage loans and to impose certain obligations on such servicers.

31.     During the Great Recession, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the ***Dodd-Frank Act"***) which transferred rulemaking authority under RESPA to the Consumer Financial Protection Bureau (***"CFPB"***).  The Dodd-Frank Act also added a section to RESPA giving the CFPB the authority to establish rules on servicers of federally-related mortgage loans for the purpose of carrying out the consumer protection goals of RESPA.

32.     In January 2013, the CFPB issued several final rules to address the systemic problems in the mortgage servicing industry described above and to implement protections for borrowers with regard to mortgage servicing and loss mitigation.  These rules amended 12 C.F.R. Part 1024, RESPA (Regulation X).  The new rules became effective on January 10, 2014.

33.     Specifically, the new rules implemented procedural protections for borrowers with regard to the process of obtaining an evaluation for loss mitigation options and restrictions on the foreclosure process while a borrower is being evaluated for a loss mitigation option. See 12 C.F.R. § 1024.41.  Servicers are prohibited from instituting foreclosure proceedings until a borrower's mortgage loan is more than 120 days delinquent.  Id. at § 1024.41(f)(1). Further, Servicers are prohibited from the practice of "dual tracking" which is the practice of initiating foreclosure proceedings while a loss mitigation application is being processed.  Id. at § 1024.41(f), (g).  Regulation X forbids foreclosure on a borrower's home until the mortgage servicer has *evaluated the borrower for all loss mitigation options*. 12 C.F.R. § 1024.41(c) & (g).

34.     If a borrower submits a facially complete loss mitigation application before the servicer has started the foreclosure process, then the servicer is prohibited from taking any action in the foreclosure process until the servicer has sent the borrower the notice required by 12 C.F.R. § 1024.41(c)(1)(ii) and the borrower either did not appeal the notice or the borrower's appeal has been denied.  Id. at § 1024.41(f)(2), (g).

35.    RESPA requires servicers to follow strict procedures for processing loss mitigation applications and to disclose certain information to borrowers about the status of their application.   See 12 C.F.R. § 1024.41.   The rules also afford consumers a private right of action against servicers that fail to comply.

36.    On June 23, 2020, in response to the Covid-19 pandemic, the CFPB issued an Interim Final Rule (IFR) amending Regulation X's Loss Mitigation Procedures to allow mortgage servicers certain exemptions to the strict requirements triggered upon receiving an application for loss mitigation from a borrower.   The new "Anti-Evasion Exception" become effective July 1, 2020. 12 C.F.R. § 1024.41(c)(2)(v)(A). This Anti-Evasion Exception offers servicers a temporary exception to the RESPA requirement to "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application," 12 CFR 1024.41(b)(1).

## CALIFORNIA'S HOMEOWNER BILL OF RIGHTS

37.    In 2012, the California state legislature enacted a series of statutes known as the Homeowner Bill of Rights (**"HBOR"**), effective January 1, 2013, which were meant to ensure fair loan servicing and loss mitigation practices for California homeowners who were in default and facing foreclosure.  The laws are designed to guarantee basic fairness and transparency by including restrictions on "dual tracking" (the act of reviewing the borrower for a modification while concurrently processing a foreclosure), requiring the servicer to provide a "single point of contact" for the borrower throughout the entire loss mitigation process until *all foreclosure prevention alternatives have been exhausted*, requiring lenders and servicers to verify foreclosure documents before recording the same, and providing a private right of action to borrowers so they can enforce their HBOR rights.  Pursuant to HBOR's private right of action, Plaintiffs have standing to bring an action to enforce the provisions found in Cal. Civ. Code §§ 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11 and 2924.17. *See* Cal. Civ. Code § 2924.12(a)(1).

## MR. COOPER GROUP AND NATIONSTAR MORTGAGE

38.     Mr. Cooper Group Inc., through its operating subsidiary, Nationstar Mortgage LLC, is the *largest non-bank mortgage servicer in the United States*.[1] As of December 31, 2019, Nationstar Mortgage serviced approximately 3.8 million loans with an aggregate balance of approximately $643 billion.[2] In 2019, Nationstar Mortgage had over $2 billion in total revenues with over 9,000 employees.[3] COOPER is also a mortgage originator and lender and ranks in the top 15 lenders in the United States of America.

39.     Nationstar Mortgage started out in Denver, Colorado in 1994 as Nova Credit Corporation. In 1997, the company moved to Dallas, Texas, where home-builder Centex Homes designated Nova Credit Corporation as their in-house lender for new construction and changed the company name to Centex Credit Corporation. In 2001, Centex Credit Corporation was merged into Centex Home Equity Company, and it operated as the subprime mortgage originator and servicer for Centex until 2005.  In 2005, Centex Homes decided to exit all of its non-core, non-home-building businesses, including the mortgage business. Fortress Investment Group (a $43 billion hedge fund) acquired Centex Home Equity and renamed it Nationstar Mortgage in 2006.  Nationstar Mortgage Holdings, Inc. went public in March 2012 with an initial public offering on the New York Stock Exchange.

40.     On July 31, 2018, Nationstar Mortgage Holdings Inc., the parent company for Nationstar Mortgage and Xome, merged with Wand Merger Corporation (a wholly owned subsidiary of WMIH Corp.) and, thereafter, Nationstar Mortgage Holdings, Inc. continued on as a wholly owned subsidiary of WMIH Corp. On October 10, 2018, WMIH changed its name to "Mr. Cooper Group Inc." and

---

[1] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-multiple-states-enter-settlement-nationstar-mortgage-llc-unlawful-servicing-practices/

[2] https://sec.report/Document/0000933136-20-000005/

[3] Id.

rebranded its mortgage operations as "Mr. Cooper."

## COOPER AND NATIONSTAR'S PATTERN AND PRACTICE
## OF VIOLATING LOSS MITIGATION RULES AND REGULATIONS

41.     In 2017, COOPER and NATIONSTAR reached a $9.2 million settlement with the California Department of Business Oversight to resolve allegations that the company overcharged borrowers and failed to properly address borrower complaints.[4]

42.     In 2018, the state of Massachusetts hit Nationstar with a fine and sanctions for allegedly putting hundreds of borrowers in the state at a heightened risk of foreclosure by offering them "unfair and deceptive" mortgage modifications.[5]

43.     Also, in 2018, The New York Department of Financial Services reached a $17 million settlement with Nationstar for numerous violations of the state's financial laws including failure to properly document and process loss mitigation requests, failure to abide by the single point of contact requirements, failure to maintain books, records and customer files in a manner required to facilitate a comprehensive assessment of its compliance with Banking Law, failure to fund over 900 mortgage loans within the timeframe set forth in various loan or other documents for individual borrowers, operation of branch locations without the Superintendent's authorization, failure to maintain required documentation in servicing files, including, but not limited to, loss mitigation correspondence, executed origination documents, welcome and good-bye letters, single-point-of-contact notices, and annual privacy notices and failure to file multiple 90-day pre-foreclosure notices.[6]

44.     In December 2020, Nationstar agreed to a $91 million settlement with

---

[4] https://dfpi.ca.gov/2017/12/04/
[5] https://www.mass.gov/news/ag-healey-secures-millions-in-relief-for-massachusetts-residents-faced-with-unfair-foreclosure
[6] https://dfs.ny.gov/reports_and_publications/press_releases/pr1804111

**CLASS ACTION COMPLAINT**

the federal Consumer Financial Protection Bureau (CFPB).[7]  The CFPB collaborated with attorneys general from all 50 states and mortgage regulators in 53 jurisdictions — including the District of Columbia and Puerto Rico — in the case against Nationstar.   The CFPB complaint, filed in federal district court in D.C., said Nationstar failed to identify requests for loss mitigation, which are supposed to help borrowers with their payments. The company allegedly foreclosed while some homeowners were still waiting for their loss mitigation applications to be processed — even though Nationstar had promised it would not do so. The mishandling of mortgages by Nationstar was discovered during reviews of the company's servicing activities, according to the claim. The investigations found that borrowers had problems when their loans were transferred to Nationstar.

## COOPER AND NATIONSTAR ESTABLISH A REAL ESTATE BROKERAGE TO EARN MORE FEES AND COMMISSIONS

45.    In its ongoing effort to add new streams of revenue to its loan origination and servicing operations, COOPER moved into various other real estate businesses such as valuation services, property inspections, title insurance and real estate brokerage.[8]

46.    In the particularly lucrative area of real estate brokerage, COOPER determined that its interaction with a vast number of real estate transactions (e.g. loan originations, mortgage servicing, and foreclosures) could be monetized through real estate commissions and auction fees which it was losing to outside third-party providers such as Auction.com and local real estate agents and brokerages.[9]

47.    Sometime in 2014-2015, COOPER launched xome.com through is operating subsidiary and real estate licensee, XOME Inc.  XOME would handle real

---

[7] https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-multiple-states-enter-settlement-nationstar-mortgage-llc-unlawful-servicing-practices/
[8] https://www.sec.gov/Archives/edgar/data/1520566/000162828016012098/nsmhinc-1231201510xk.htm
[9] Id.

estate listings, auctions and sales and earn commissions and fees in the process. XOME had a built-in funnel of real estate business through the mortgages COOPER originated, serviced and/or foreclosed upon.

48.   A significant portion of foreclosed mortgages that COOPER services will become REO assets (real estate owned) of COOPER'S mortgage servicing clients.   These REOs must be inspected, repaired and listed for sale.   COOPER established subsidiaries to handle all these activities including having XOME be the licensed real estate agent for the listing and sale of the REOs.   Therefore, COOPER can make money by (a) originating the loan, (b) selling the loan to a note buyer/investor, (c) servicing the loan for that investor, (d) foreclosing on that loan for the investor, (e) inspecting and preserving that foreclosed home for the investor, (f) listing and selling the home for that investor.   When COOPER and XOME take a home through foreclosure and subsequently list it for sale, they can make upwards of an additional 6% of the value of the home.

49.   These extensive costs, fees and commissions that result from the foreclosure and subsequent relisting and sale by XOME would not be available to COOPER had the borrower received a loan modification or other loss mitigation which allowed the borrower to keep their home.   Since COOPER'S processing and finalizing of loss mitigation requests from borrowers is not lucrative, COOPER, NATIONSTAR and XOME have significant financial incentives to push borrowers into foreclosure rather than allow any loss mitigation/foreclosure avoidance option.

50.   In fact, COOPER'S 2019 Form 10-K filing with the SEC, indicates that XOME generated over $420 million in service-related revenue which _exceeded_ the revenue from COOPER'S mortgage servicing operations (at $408 million).[10]

51.   XOME is an exceedingly profitable business for COOPER and it presents a very troubling conflict of interest with respect to COOPER'S obligations

---

[10] https://sec.report/Document/0000933136-20-000005/

**CLASS ACTION COMPLAINT**

to borrowers under state and federal laws.

## COOPER, NATIONSTAR AND XOME MOVE INTO THE
## SHORT SALE BUSINESS TO EARN MORE FEES AND COMMISSIONS

52.    COOPER immediately recognized that real estate brokerage could generate incredible profits and began searching for other real estate transactions that it could inject XOME into for more fees and commissions.   One area of loss mitigation where COOPER made very little money and, in fact, lost a stream of revenue, was when a borrower successfully completed a short sale of a home in foreclosure.   Not only did COOPER lose the possibility of continued servicing fees and administrative costs once a home was sold, but it also lost out on the commissions it could have made post-foreclosure by listing and selling the REO asset through XOME.

53.    In a short sale, the homeowner (i.e. the borrower on the loan which COOPER is servicing) requests approval to sell the home even though the value is below the balance on the mortgage.   In this situation, the note holder/investor (the ***"short sale lender"***) must agree to accept less than the full balance owed on the mortgage so that the property can be transferred to the buyer, free and clear of any mortgage encumbrance.   The short sale lender will take a loss but recognizes that foreclosing on the home would result is a sale at current market value such that the loss will be about equal in either case.   Obviously, if a short sale fails, the only other option is a foreclosure.

54.    Typically, a borrower will seek options to retain their home first through either a repayment plan or a loan modification.   In situations where home retention is not possible, it is the mortgage servicer that suggests various non-retention options (such as selling if there is equity or a short sale if there is no equity).   The mortgage servicer directs the homeowner to hire a licensed real estate agent to list the home for sale and procure a ready, willing and able buyer.

55.    Once an offer is received, the real estate agent for the homeowner

submits the offer documents along with a formal request for mortgage assistance (non-retention) to the mortgage servicer.  The short sale lender requires an appraisal or "broker price opinion" to be completed to ensure that the offer amount is at market value of the home.  The short sale lender will also review the costs and fees that are included in the transaction to be sure that their net payment is not affected by inappropriate amounts.

56.    If the offer amount, costs and fees, and net proceeds are acceptable to the short sale lender, then a written approval is generated and the parties move forward to the closing and transfer of the property.

57.    The short sale lender requires that any resulting transaction be 'arm's length' and that the seller and buyer not be affiliated in any way. Further, the short sale lender mandates that the borrower cannot rent the home back or buy the home from the buyer after the short sale is complete.  These requirements, attested to under penalty of perjury, are required to avoid fraud in situations where a homeowner might have a family member or friend purchase the home at the current market value (and help the borrower avoid the remaining balance).

58.    As explained above, once a short sale is closed and the property transfer complete, COOPER no longer earns servicing fees and XOME no longer has the opportunity to be the listing agent for an REO asset.

59.    Seeing the huge profits from the real estate brokerage busines through XOME, COOPER decided to insert itself and XOME into the thousands of short sales its customers complete each year.

60.    COOPER instituted a program that requires each borrower that submits a short sale offer for review to turn over the marketing, buyer selection and sale process to XOME.  Therefore, despite having a borrower customer in an active loss mitigation review, COOPER forces homeowners and their real estate agents to reject the initial accepted short sale offers in hand and turn the short sale process over to XOME so that XOME can charge and attempt to collect a 5% processing fee.

61.    COOPER threatens to ignore all loss mitigation request and continue to foreclosure if the homeowner refuses to work with XOME as the real estate brokerage in the short sale despite COOPER having specifical loss mitigation obligations under state and federal rules, regulations and laws.

62.    Once in the short sale process, COOPER is concurrently the servicer on the mortgage loan, the processor of the foreclosure against the homeowner and the real estate broker for the homeowner's short sale request.

63.    Even more troubling, XOME takes over sole responsibility for buyer solicitation, buyer registration, offer evaluation and negotiation, offer selection, and drafting of the purchase contracts all outside the purview of the homeowner and his or her real estate agent.

64.    COOPER fails to provide any affiliate business disclosures as required by RESPA and fails to abide by basic fiduciary duties and state real estate laws and regulations, claiming to represent neither party to the purchase and sale transaction. DEFENDANTS charge illegal and unearned commissions in the short sale.

65.    In the end, if the property goes to foreclosure because the short sale fails, XOME almost certainly will become the listing agent for the note holder/investor for the listing and sale of the REO asset.  Further, in the event the property goes to foreclosure, COOPER stands to make even more money through the property preservation process and administrative fees during the extended period in which the note holder/investor is the owner of the REO asset.

66.    As alleged herein below, the conflicts of interest are staggering and completely unethical and illegal.  DEFENDANTS are concurrently foreclosing on the homeowner's property (as a fiduciary for the note holder/investor) while actively marketing that property for sale (as a fiduciary for the homeowner).  These conflicts of interest are inherent and unwaivable.

67.    In its own 2019 Form 10-K filing with the SEC, COOPER acknowledges that its XOME structure and business practices might have a negative

impact on securing new clients based upon the "perceived conflict of interest concerns."[11]   What COOPER is acknowledging is that being a lender, originator, servicer, appraiser, property inspector, foreclosure processor, title insurance company and real estate brokerage can lead to situations where the mortgage servicer is incentivized to prefer its profits over client (or borrower) satisfaction or legal obligations.

68.   As stated by COOPER in its 2019 Form 10-K[12]:

*We could have, appear to have or be alleged to have conflicts of interest with Xome.* Xome provides services to us which could create, appear to create or be alleged to create conflicts of interest. By obtaining services from a subsidiary, there is risk of possible claims of collusion or claims that such services are not provided by Xome upon market terms. […]   Appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation, which is one of our most important assets, could be damaged and the willingness of counterparties to enter into transactions with us may be affected if we fail, or appear to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

69.   Plaintiffs are informed and believe, and thereon allege, that, other than COOPER, no national mortgage servicer requires homeowners seeking short sales to use the services of a real estate brokerage owned and/or controlled by said mortgage servicer in order to solicit buyers, "validate" offer amounts, draft short sale contracts or secure approval of the short sale.

## PRELIMINARY ALLEGATIONS - NAMED PLAINTIFFS' FACTS

70.   On February 10, 2006, Plaintiffs purchased the Property for $370,000 and concurrently took out a purchase money mortgage in the amount of $295,900 (the *"Loan"*) which was secured by a deed of trust (the *"Deed of Trust"*)

---

[11] "Furthermore, in the Business to Business area, Xome may not be able to attract and retain clients who view themselves as Mr. Cooper's competitors due to perceived conflict of interest concerns." https://sec.report/Document/0000933136-20-000005/
[12] Id.

**CLASS ACTION COMPLAINT**

encumbering the Property and recorded in the Official Records of Riverside County on February 10, 2006 as Document No. 2006-106330. The Loan was made for Plaintiffs' personal, family or household purposes.

71.    The original trustee under the Deed of Trust was Mortgage Electronic Registration Systems, Inc. The original beneficiary under the Deed of Trust was GreenPoint Mortgage Funding, Inc (collectively with its successors and assigns, *"Lender"*). At the time of the actions alleged herein, NATIONSTAR was the mortgage servicer (the *"Servicer"*) for the Loan on behalf of the Lender.

72.    Plaintiffs made payments on the Loan until they had financial difficulties and defaulted on the Loan. On September 28, 2018, Lender and Servicer issued a *Notice of Default and Election to Sell Under Deed of Trust* (the *"Notice of Default"*) and recorded the same against the Property in the Official Records as Document No. 2018-387541. Thereafter, NATIONSTAR actively pursued foreclosure against the Property, recording a Notice of Trustee's Sale against the Property on March 14, 2019 as Document No. 2019-0085789.

73.    In an effort to avoid foreclosure, Plaintiffs sought loss mitigation options and ultimately elected to sell the home pursuant to a short sale which is a recognized foreclosure prevention alternative under Regulation X of RESPA and California's Homeowner Bill of Rights.

74.    At the direction of NATIONSTAR, on or about July 17, 2019, Plaintiffs hired and engaged Realtor Magdalena Guajardo (*"Guajardo"*) to serve as their real estate agent to list and market the Property, negotiate with potential buyers, draft purchase & sale documents and disclosures and to complete the sale of the Property on their behalf.  Plaintiffs and Guajardo entered into a formal *Residential Listing Agreement – Exclusive Authorization and Right to Sell* dated July 17, 2019 (the *"Listing Agreement"*).

75.    The Listing Agreement granted Guajardo the exclusive and irrevocable right to list, market and sell the Property from July 17, 2019 until March 21, 2020.

76.     The Listing Agreement requires Plaintiffs to pay Guajardo six percent (6.0%) of the listing price of $245,000 as compensation for services performed under the Listing Agreement for the procurement of a ready, willing and able buyer.

77.     Guajardo promptly listed the Property on the Multiple Listing Service (MLS) and widely marketed the home to interested buyers.

78.     On or about July 24, 2019, Guajardo located a ready, willing and able buyer (the *"Initial Buyer"*) and procured a purchase offer on the Property in the amount of $280,000.  The Initial Buyer provided verification of proof of funds for the acquisition.  Plaintiffs accepted the $280,000 offer and entered into a purchase and sale contract with the Initial Buyer (the *"Purchase Contract"*).

79.     The Purchase Contract and all supporting documents were delivered to NATIONSTAR along with a required request for short sale approval.

80.     On August 16, 2019, Plaintiffs received a letter from NATIONSTAR (the *"Program Letter"*) stating that DEFENDANTS would not review the loss mitigation request or the Purchase Contract and that Plaintiffs and Guajardo were *required* to participate in DEFENDANTS' proprietary auction process for the short sale (the *"Auction Program"*) which would be managed exclusively by XOME.

81.     The Program Letter makes it clear that NATIONSTAR will not review or consider *any* offer procured by Guajardo or Plaintiffs outside of the Auction Program.  Further, NATIONSTAR will not review or consider *any* short sale request, unless Plaintiffs and Guajardo agree to the Auction Program's Terms and Conditions.

82.     The Program Letter requires both Guajardo and Plaintiffs to sign the terms and conditions of the Auction Program within 10 days or else NATIONSTAR would not process any short sale loss mitigation request whatsoever.

83.     The Program Letter confirms that DEFENDANTS were aware that Plaintiffs had already engaged Guajardo, a licensed real estate agent, and DEFENDANTS were aware of the contractual and fiduciary relationship between the

homeowner and the agent.

84.    The Program Letter confirms that DEFENDANTS were aware that Plaintiffs had already entered into a valid purchase and sale contract and that Plaintiffs were requesting loss mitigation pursuant to a short sale.

85.    However, without reviewing Plaintiffs' loss mitigation request and without reviewing Plaintiffs for all available foreclosure prevention alternatives, DEFENDANTS forced Plaintiffs into DEFENDANTS' distressed property, private auction process pursuant to the Auction Program.

86.    As required by the Auction Program, Plaintiffs and Guajardo turned over the listing and marketing of Plaintiffs' Property along with the solicitation of buyers and negotiations of the purchase terms to NATIONSTAR'S affiliate, XOME, and, under threat of losing the home to foreclosure, agreed to a 5% fee (the ***"Processing Fee"***) to be paid to DEFENDANTS for processing the foreclosure prevention alternative via a short sale.

87.    The Program Letter states that DEFENDANTS will take over the advertising and marketing of the Property through Xome's auction website, print advertising, web media, direct mail, and email marketing.  DEFENDANTS, in fact, directed Plaintiffs' real estate agent to change language in Plaintiff's MLS listing and to direct all potential buyers to DEFENDANTS for negotiation and offer submission. Further, DEFENDANTS, in fact, took over the advertising and marketing Property for sale to the public.

88.    Pursuant to the Terms and Conditions of the Auction Program, Plaintiffs' real estate agent was no longer free to conduct her duties under the Listing Agreement because she became bound by the terms of the Auction Program which required Plaintiffs and the real estate agent to turn over all marketing, solicitation, negotiation and contracting activities to XOME.

89.    Neither Guajardo nor Plaintiffs were offered an option to opt-out of listing the Property on Xome's website which is associated with distressed and

damaged real estate, homes subject to foreclosure trustee sales, real estate owned by lenders after foreclosure and other negative aspects which significantly depress real estate values.

90.    Further, once in the Auction Program, NATIONSTAR turned over and relinquished all loss mitigation processing and communication to XOME personnel, thereby eliminating Plaintiffs' single point of contract for the loss mitigation process.

91.    Pursuant to the Terms and Conditions of the Auction Program, DEFENDANTS required that Plaintiffs' home be auctioned off to the highest bidder in a process exclusively controlled by XOME and its brokers, agents and employees.

92.    The Program Letter indicates that DEFENDANTS will make direct contact with prospective buyers, and those buyers' real estate agents, upon completion of the auction process to discuss the material terms of the offer on the Property without the involvement of either Plaintiffs or Guajardo.

93.    DEFENDANTS, in fact, auctioned the Property through DEFENDANTS' Auction Program, negotiated with buyers for the purchase of the Property and selected one of the potential buyers as the "winning bidder."

94.    The Program Letter indicates that DEFENDANTS will draft and provide Plaintiffs and their real estate agent a final purchase and sale contract after the event has ended which will have been negotiated between DEFENDANTS and the prospective buyer and which must be signed by Plaintiffs within 48 hours. Plaintiffs and their real estate agent are not allowed to negotiate any terms or change any provisions of DEFENDANTS' contract.  However, even after signed by all parties, said contract remains subject to DEFENDANTS' "final written approval, which may be withheld for any or no reason."

95.    Once the auction event was complete, DEFENDANTS drafted and mandated the use of their form purchase contract (the ***Xome Contract***) under the Auction Program.  The Terms and Conditions dictate that "[o]nce the event has ended, the buyer will be asked to sign the purchase contract with the winning

bidder." "The signed contract and all supporting documentation will be sent to your listing agent to obtain your signatures." Plaintiffs and their real estate agent were given no right or ability to be involved in negotiating or drafting the Xome Contract. DEFENDANTS presented the XOME Contract to Plaintiffs and Guajardo on a take it or leave it basis, as determined and drafted by DEFENDANTS.

96.    As part of the Xome Contact, Defendants included and charged the 5% XOME Processing Fee which would be paid through escrow as part of the real estate settlement procedures concurrent with the closing of the sale of the Property.

97.    Neither Plaintiffs, nor their real estate agent, who was hired to handle the listing, marketing, sale, contracting and closing of the Property, were allowed to see any of the proposed offers from the Xome auction process or any of the contract terms related to any buyer *selected* by DEFENDANTS as part of the Auction Program.

98.    DEFENDANTS forced Plaintiffs and their real estate agent into the Auction Program against their will by refusing to review a valid loss mitigation request, ignoring all foreclosure prevention alternatives and threating immediate foreclosure and eviction.

99.    Pursuant to the Auction Program, DEFENDANTS took the following actions (collectively, the ***"Auction Program Activities"***):

    a.    Published and listed Plaintiff's Property for sale on websites owned and controlled by DEFENDANTS;

    b.    Marketed Plaintiffs' Property for sale to the public;

    c.    Directly solicited buyers for the purchase of Plaintiffs' Property;

    d.    Required Plaintiffs' real estate agent to change the active MLS listing to direct all potential buyers to websites owned and controlled by DEFENDANTS instead of submitting offers to Plaintiffs' real estate agent;

    e.    Required Plaintiffs' real estate agent to change the listing price for Plaintiffs' Property in the sole discretion of DEFENDANTS and without

authority or consent of Plaintiffs as the Property owner;

f.     Reserved the right to make their own "shill bid" on Plaintiffs' Property without requiring approval from Plaintiff;

g.     Directly negotiated with buyers on the terms and conditions of the purchase and sale of Plaintiffs' Property without Plaintiffs authorization or approval;

h.     Directly negotiated with buyers on the real estate commissions without Plaintiffs authorization or approval;

i.     Unilaterally selected the buyer of Plaintiff's Property from various submitted offers without presenting all offers to Plaintiffs;

j.     Negotiated, prepared, drafted and required the use of form Xome purchase contracts and addenda for the sale of Plaintiffs' Property, and

k.     Collected a real estate commission for the sale of Plaintiffs' Property.

100.   Throughout the Auction Program, DEFENDANTS controlled the foreclosure process, the loss mitigation process and the Property listing, marketing, contracting and sales process.  Further, DEFENDANTS controlled the actions of Plaintiffs' real estate agent through the Auction Program such that the real estate agent lacked the ability to act independently and lacked the ability to comply with his or her fiduciary obligations.

101.   As a result of DEFENDANTS' actions pursuant to the Auction Program and their takeover of the listing, marketing and sale process of the Property, the short sale failed.

102.   On February 19, 2020, NATIONSTAR conducted a foreclosure auction on the Property and an investor purchased the home at the public auction for $260,000, which is $20,000 less than the offer procured by Guajardo on the Property.

103.   On February 28, 2020, Plaintiffs lost ownership of their Property when a Trustee's Deed Upon Sale was recorded in the Official Records removing Plaintiff

1 | from title.

2 | **CLASS ACTION ALLEGATIONS**

3 | 104. As more specifically set forth below, Plaintiffs brings this action on
4 | behalf of an ascertainable class and a well-defined community of interest among the
5 | class members. Code Civ. Proc. § 382; *Richmond v. Dart Industries, Inc.* (1981) 29
6 | Cal.3d 426, 470.

7 | 105. Throughout the operative limitations period, Plaintiffs and all other
8 | proposed class members were denied the protections and benefits of various state
9 | laws, including common law protections, and California's Unfair Competition laws
10 | due to DEFENDANTS' standard practices.

11 | 106. Specifically, DEFENDANTS require homeowners (*"Homeowners"*)
12 | and their licensed real estate agents and/or brokers (*"Agents"*) to participate in the
13 | *Auction Program* when those Homeowners request loss mitigation in the form of a
14 | short sale of their residential real estate (*"Homes"*). Plaintiffs and other Homeowners
15 | who were required to participate in the Auction Program make up the proposed class.

16 | 107. On information and belief, Plaintiffs allege the listing agreement
17 | ("*Listing Agreement*") set forth in **Exhibit A**, is a standard form listing agreement
18 | and that the class members use that form or a substantially similar form in all
19 | transactions with Agents. On information and belief, Plaintiffs allege that each class
20 | member had a valid and enforceable Listing Agreement with an Agent regarding the
21 | listing and sale of a Home.

22 | 108. The Auction Program is mandatory and contains standard *"Terms and*
23 | *Conditions"* found in the *"Program Letter"* that are imposed on all Homeowners
24 | and Agents who wish to have their loss mitigation requests considered by
25 | DEFENDANTS. On information and belief, Plaintiffs allege that the "Program
26 | Letter" set forth in **Exhibit B**, is the same Program Letter delivered to all members
27 | of the proposed class, and that the "Terms and Conditions" set forth in **Exhibit B**, are
28 | the same Terms and Conditions imposed on all members of the proposed class.

109.   As alleged herein, pursuant to the Listing Agreements, Homeowners hire Agents and grant the exclusive and irrevocable right to list and market the Homes for sale, solicit potential buyers, negotiate with potential buyers, draft purchase & sale documents and disclosures, negotiate with third-party lien holders, and complete the short sale of the Homes.   The Listing Agreements require Homeowners to pay Agents a commission based upon the list price or the agreed contract price for the Homes.

110.   On information and belief, Plaintiffs allege that each Homeowner requested that NATIONSTAR consider a short sale for the subject Home as the preferred loss mitigation option and as the Homeowners' selected foreclosure prevention alternative.

111.   On information and belief, Plaintiffs allege that NATIONSTAR responded to Homeowners' requests for a loss mitigation review with the Program Letter stating that DEFENDANTS would not review any loss mitigation request or any short sale and that the Homeowner and the Agent are *required* to participate in DEFENDANTS' Auction Program and be subject to the Terms and Conditions.

112.   Pursuant to the Terms and Conditions, DEFENDANTS refuse to review or consider *any* offer procured by Homeowners or Agents outside of the Auction Program.   Further, DEFENDANTS refuse to review or consider *any* short sale request unless Homeowners and Agents agree to be bound by the Terms and Conditions of the Auction Program which includes the imposition of the XOME Processing Fees.

113.   DEFENDANTS were aware that the Homeowners had already engaged Agents, and DEFENDANTS were aware of the contractual and fiduciary relationship between the Homeowners and the Agents.

114.   During the Auction Program and pursuant to the Terms and Conditions, DEFENDANTS control the foreclosure process, the loss mitigation process and the listing, marketing, negotiating, contracting and sales process for each Home.

115.   DEFENDANTS use the threat of foreclosure and eviction to force Homeowners and Agents, against their will, into the Auction Program with the intent to interfere with the Listing Agreements and the Agents' activities thereunder so that DEFENDANTS can secure the XOME Processing Fee.

116.   Once in the Auction Program, NATIONSTAR turns over and relinquishes all loss mitigation processing and communication to XOME personnel and removes any assigned single point of contact.

117.   Pursuant to the Auction Program, DEFENDANTS require the Homes to be auctioned off to the highest bidder in a process exclusively controlled by XOME and its brokers, agents and employees, and DEFENDANTS charge the 5% Processing Fee to process the loss mitigation process.

118.   Pursuant to the Auction Program, DEFENDANTS take the above referenced Auction Program Activities.

119.   The Auction Program Activities require a real estate license under various state laws and regulations.

120.   DEFENDANTS are acting as real estate brokers and agents, by inter alia, conducting and completing the Auction Program Activities and owe a fiduciary duty to Homeowners while listing, marketing, negotiating, contracting and selling the Homes on behalf of the Homeowners.  However, in their role of Loan Servicer, DEFENDANTS also have a contractual relationship and conflicting fiduciary duties to the Lender, to collect the Loan balance against Homeowners, process active foreclosures against the Homes and, thereafter, evict the Homeowners.  Throughout the Auction Program, DEFENDANTS controlled the foreclosure process, the loss mitigation process and the listing, marketing, contracting and sales process for the Homes.

121.   DEFENDANTS use undue influence and Homeowners' duress to force Homeowners and Agents into the Auction Program in order to collect DEFENDANTS' Processing Fees.  Further, DEFENDANTS use their position of

1  power to wrongfully control the actions of Agents, as real estate licensees, to the

2  detriment of the Homeowners.

3      122.  At the time of the conduct alleged herein, DEFENDANTS had no

4  ownership interest in the Homes. Therefore, DEFENDANTS had no legal right to

5  unilaterally enter into a purchase and sale agreements related to the Homes, nor did

6  they have any right to solicit potential buyers, negotiate contract terms, select the

7  final buyer or draft contracts for the proposed transaction. However, DEFENDANTS

8  take action with respect to such Homes as if they are the owner rather than simply

9  the servicer of the mortgage debt.

10     123.  DEFENDANTS are not a party to the exclusive listing agreements

11  referenced herein and have no financial interest in the listing, marketing or

12  contracting process related thereto.

13     124.  DEFENDANTS' actions interfere with Homeowners exclusive Listing

14  Agreements with the Agents. DEFENDANTS' Terms and Conditions vaguely

15  acknowledge that there are outstanding listing agreements between homeowners and

16  their chosen agents. However, DEFENDANTS' actions through the Auction

17  Program intentionally disrupts numerous terms of the listing agreement and

18  frustrated the main purpose ("exclusivity") conferred to the Agents in those

19  contracts. The listing agreements grant Plaintiff and all other class members the

20  "exclusive" rights to market and sell the property. The entire nature of the Auction

21  Program (directed at marketing and selling the Homes) inherently takes away the

22  Agents' exclusive right to marketing and seeking buyers for the homeowners.

23     125.  Through the Auction Program, DEFENDANTS are knowingly and

24  intentionally disrupting and interfering with those exclusive Listing Agreements.

25  These actions caused each of the Homeowners to suffer damages and delays in the

26  loss mitigation process.

27     126.  As of the date of this Complaint, COOPER and NATIONSTAR have

28  failed to bring their system for processing loss mitigation applications into

compliance with state and federal law.  In fact, COOPER and NATIONSTAR have added financial incentives which promote violation of those laws.

127.  Plaintiffs and members of the proposed classes allege Defendants violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, its implementing regulations, 12 C.F.R. §§ 1024.1-1024.41, and California's Homeowner Bill of Rights ("HBOR"), Cal. Civ. Code §2923.5 *et seq*.

128.  Plaintiffs and members of the proposed classes submitted loss mitigation applications under RESPA and HBOR.  Defendants violated RESPA and HBOR by failing to adhere to the requirements of 12 C.F.R. §§ 1024.40-1024.41 and Cal. Civ. Code §§ 2923.6, 2923.7, 2924.10, 2924.11 and 2924.17 with respect to the Plaintiffs and class members' loss mitigation applications.

129.  Plaintiffs and members of the proposed classes allege Defendants illegally delayed or ignored valid loss mitigation and foreclosure prevention requests in order to push homeowners into foreclosure where defendants could make additional profits.

130.  Plaintiffs and members of the proposed classes allege Defendants illegally interfered with short sale transactions and violated various fiduciary duties as part of those transactions in order to charge illegal processing fees and unearned commissions.

131.  Plaintiffs bring this action on the grounds that they and other similarly situated individuals were denied statutory and common law protections resulting from the above-referenced violations.

132.  Plaintiffs bring the first, fourth, eighth, ninth and tenth counts as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following persons who make up the "Nationwide Class":

> All current and former residents within the United States of America, who sought a short sale of their home through NATIONSTAR and who were instructed they were required to participate in the Auction Program.

**CLASS ACTION COMPLAINT**

133.   Plaintiffs bring the second, third, fifth, sixth, seventh, eleventh, twelfth, thirteenth, fourteenth and fifteenth count as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following persons who make up the "California Class":

> All current and former California residents, who sought a short sale of their home through NATIONSTAR and who were instructed they were required to participate in the Auction Program.

134.   The class is ascertainable from DEFENDANTS' own records, including, *inter alia*, the short sale applications and DEFENDANTS' form responses thereto, and through class member's experiences as Homeowners who submitted a short sale application to DEFENDANTS. The class is further ascertainable from XOME's internal records, including all records from its auction website.

135.   The class on whose behalf this action is brought is so numerous that joinder of all parties individually would be impracticable. Plaintiffs are unaware of the exact class size, however it is believed to be in excess of several thousand individuals, and therefore satisfies the numerosity standards.

136.   Class members share a community of interest and an injury-in-fact as DEFENDANTS have violated state and federal law, depriving class members of their statutory and common law rights and causing harm thereby including loss of opportunity, loss of property and damage to reputation. There are questions of fact and law common to the class that predominate over any questions affecting only individual members. The questions of law and fact common to the class arising from DEFENDANTS' actions include, without limitation, the following:

      (a)    Whether DEFENDANTS improperly and illegally interfered with class members' exclusive listing agreements, entered into with Agents, by forcing the Homeowners into the Auction Program?

      (b)    Whether DEFENDANTS' conduct caused violations of RESPA, and for the California Class, violations of HBOR?

(c)    Whether DEFENDANTS charged improper and illegal fees as part of the Auction Program?

(d)    Whether DEFENDANTS violated their fiduciary duties as part of the Auction Program?

(e)    Whether DEFENDANTS committed unfair and illegal debt collection practices as part of the Auction Program?

(f)    Whether the class members were damaged as a result of DEFENDANTS' refusal to review the valid short sale agreements presented to it?

(g)    As to the California Class, whether DEFENDANTS' conduct also constituted an unfair or illegal practice in violation of Business & Professions Code section 17200.

137.   Any minor variations in experience between the individual class members are legally insignificant to the issues presented by this action since the central facts remain, to wit, Plaintiffs and all other class members were subjected to DEFENDANTS' Auction Program. The standard terms and conditions imposed by DEFENDANTS resulted in multiple violations of law. Common questions of law or fact therefore "present a significant aspect of the case" and are capable of resolution "in a single adjudication." *Hanlon v. Chrysler Corp.* (9th Cir. 1998) 150 F.3d 1011, 1022. The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for DEFENDANTS, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the class who are not parties to the adjudications or would substantially impair or impede those non-party class members' ability to protect their interests.

138.   Plaintiffs, and all class members, were injured by DEFENDANTS violations of law as set forth below. As these violations resulted from DEFENDANTS standard and institutionalized practices, questions of law and fact

are common to the class.

139.   Plaintiffs' claims in this action are typical of the class whom Plaintiffs generally represent. The claims result from DEFENDANTS' standard and institutionalized practices, experienced by Plaintiffs and all other class members.

140.   Plaintiffs can fairly and adequately protect the interests of all the members of the class they represent in this action. Plaintiffs' experience and knowledge of DEFENDANTS' practices, entitles them to adequately and fairly represent the class.

### FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY – NATIONWIDE CLASS

### *(By Plaintiffs, individually and on behalf of the proposed Nationwide Class,*

### *Against XOME and DOES 1 - 50)*

141.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

142.   As alleged further above, XOME is acting as a real estate broker, by inter alia, conducting and completing the Auction Program Activities on behalf of Plaintiffs and the class members.

143.   The Auction Program Activities require a real estate license under various state laws which regulate real estate agents and brokers.

144.   XOME undertook the Auction Program Activities on behalf of Plaintiffs and the class members in order to secure financial compensation in the form of the 5% Processing Fee payable to XOME.

145.   COOPER and NATIONSTAR required Plaintiffs and the class members to participate in the Auction Program and use the real estate services of XOME under threat that Plaintiffs and the class members (a) would not be reviewed for any loss mitigation options as otherwise required by Regulation X of RESPA (and state counterparts), (b) would be foreclosed upon by COOPER and NATIONSTAR and (c) would be evicted thereafter by COOPER and NATIONSTAR.

146.   COOPER and NATIONSTAR required Plaintiffs and the class members to use the XOME contracts and other documents as part of the Auction Program under threat Plaintiffs and the class members (a) would not be reviewed for any loss mitigation options as otherwise required by Regulation X of RESPA (and state counterparts), (b) would be foreclosed upon by COOPER and NATIONSTAR and (c) would be evicted thereafter by COOPER and NATIONSTAR.

147.   Through the terms of the Program Letter and the Auction Program, and by the course of conduct between the parties, XOME owes a fiduciary duty of utmost care, integrity, honesty and undivided loyalty in all dealings with the Plaintiffs and the class members. XOME also had a duty to exercise reasonable skill and care in performance of their duties as well as a duty to disclose all facts known to XOME materially affecting the value or desirability of the real estate involved or which would interfere with the performance of XOME'S duties in representing Plaintiffs and the class members. This fiduciary and confidential relationship was never repudiated by Plaintiffs or any class member at any time mentioned herein.

148.   XOME breached its fiduciary duty to Plaintiffs and the class members as follows:

        a.  failing to properly and competently represent Plaintiffs and the class members as described herein;

        b.  acting as a real estate agent in the transaction without a valid listing agreement;

        c.  allowing unlicensed employees to conduct activities requiring a real estate license;

        d.  refusing to review, consider or submit Plaintiffs' and class members' original purchase contracts;

        e.  posting Plaintiffs' and class members' homes for sale without a valid listing agreement and using the postings as marketing for XOME'S private website;

f.  soliciting buyers without a valid listing agreement;

g.  failing to fully disclose all offers made on the subject properties to Plaintiffs and class members;

h.  interfering with and delaying Plaintiffs' and the class members' loss mitigation process through the Auction Program;

i.  interfering with Plaintiffs' and the class members' loss mitigation rights under Regulation X of RESPA and state counterparts;

j.  charging, collecting or attempting to collect real estate commissions without a valid written commission agreement;

k.  disclosing confidential information about Plaintiffs and the class members to potential buyers without express permission of Plaintiffs or the class members, including, without limitation, Plaintiffs' and class members' financial position, motivations, bargaining position and other personal information including Plaintiffs' and class members' willingness to accept a lower price than the listing price;

l.  negotiating the price and related financial terms on behalf of both Plaintiffs and the class members, on the one hand, and potential buyers, on the other hand, without the express permission of Plaintiffs or the class members to represent such buyers in the proposed transactions.

m. failing to properly disclose XOME'S affiliated business arrangements with NATIONSTAR and COOPER and the associated costs, fees and terms associated with those affiliated business arrangements.

n.  failing to disclose all documents, contracts and addenda associated with the purported sale of the subject properties;

o.  failing to disclose known fees and charges as part of the proposed short sales;

**CLASS ACTION COMPLAINT**

p.  taking unconscionable advantage of Plaintiffs and class members through the Auction Program while XOME'S affiliates processed foreclosures against Plaintiffs and the class members while concurrently ignoring Plaintiffs' and the class members' rights under RESPA so that XOME could benefit financially to Plaintiffs' detriment.

149.  A ***duty of loyalty*** is one of the most fundamental fiduciary duties owed by a real estate agent to that agent's principal. This duty obligates a real estate agent to act at all times solely in the best interests of that agent's principal to the exclusion of all other interests, including the agent's own self-interest. A corollary of this duty of loyalty is a ***duty to avoid any conflicts of interest*** that might compromise or dilute the real estate agent's undivided loyalty to the principal's interests. Thus, a real estate agent's duty of loyalty prohibits the agent from accepting employment from any person whose interests compete with, or are adverse to, the principal's interests.

150.  XOME and NATIONSTAR are under common ownership by COOPER, and XOME'S actions are controlled by NATIONSTAR and COOPER. In their role of mortgage servicer, NATIONSTAR and COOPER have a contractual relationship with the note holder/investor of the mortgage loan being serviced which includes fiduciary obligations to that client.  NATIONSTAR and COOPER are engaged by note holders/investors to collect on loans against Plaintiffs and the class members and to process the active foreclosure against Plaintiffs and the class members and, thereafter, to evict Plaintiffs and the class members from their homes and possibly seek deficiency judgements.

151.  Throughout the Auction Program, NATIONSTAR and COOPER controlled the foreclosure process, the loss mitigation process and, through XOME, also controlled the Property listing, marketing, contracting and sales process. However, by taking on the Auction Program Activities, XOME entered into agency relationships with Plaintiffs and the class members and accepted known conflicting

fiduciary duties to Plaintiffs and the class members with respect to their properties and the proposed short sales thereof.

152. Further, NATIONSTAR, COOPER and XOME controlled the actions of Plaintiffs'/class members' real estate agents through the Auction Program such that the real estate agents lacked the ability to act independently and were unable to fulfill their own fiduciary obligations to Plaintiffs and the class members.

153. In taking the above actions, XOME had numerous and significant unwaivable conflicts of interests.

154. XOME breached its duty of undivided loyalty to Plaintiffs and the class members as follows:

    a. coordinating activities with NATIONSTAR and COOPER during active foreclosure actions against Plaintiffs and class members while concurrently representing Plaintiffs and class members as a licensed real estate broker in the proposed short sales by listing and marketing the homes, soliciting buyers, negotiating terms, drafting purchase contracts and addenda, collecting commissions on the sale of those properties, and requiring the use of the XOME form contracts and documents.

    b. coordinating with NATIONSTAR and COOPER in forcing Plaintiffs' and the class members to use the services of XOME in the sale of the subject properties so that NATIONSTAR, COOPER and XOME could benefit financially by charging the XOME Processing Fees.

    c. having an undisclosed conflict of interest in the possible relisting and resale of Plaintiffs' and the class members' properties should those properties be foreclosed upon by NATIONSTAR and COOPER on behalf of their mortgage servicing clients. This undisclosed, potential secret profit created a conflict of interest in that

NATIONSTAR, COOPER and XOME could make more money through the foreclosure of Plaintiffs' Property as compared to a successful short sale.

d. refusing to consider the original purchase contracts which may have been much more beneficial to the homeowner. In taking such action, XOME was protecting the interests of COOPER and NATIONSTAR along with the interest of the mortgage servicing clients rather than the interests of the homeowners it represented.

e. putting its personal interests and the interested of COOPER and NATIONSTAR ahead of the interests of its clients.

155. As a proximate result of XOME'S breach of duties to Plaintiffs and the class members, Plaintiffs and the class members have been damaged in an amount to be determined according to proof at trial. As a further proximate result of XOME'S breach of duties, Plaintiffs and the class members were forced to retain legal counsel resulting in additional costs incurred by Plaintiffs and class members in an amount subject to proof.

156. The above-alleged acts and omissions of XOME were done with the intention of depriving Plaintiffs and the class members of property or legal rights or otherwise causing injury and is despicable conduct that subjected Plaintiffs and the class members to unjust hardship in conscious disregard of Plaintiffs' and the class members' rights. Such conduct was willful, oppressive, fraudulent, and malicious in that XOME acted and/or failed to act with the intent to injure Plaintiffs and the class members and/or in conscious disregard of Plaintiffs' and the class members' rights. Plaintiffs and the class members are therefore entitled to punitive damages.

**SECOND CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY – CALIFORNIA CLASS**

*(By Plaintiffs, individually and on behalf of the proposed California Class,*

*Against XOME, SIMMONS, O'LEARY and DOES 1 - 50)*

157.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

158.   As alleged further above, XOME, SIMMONS, O'LEARY (the **"LICENSEE DEFENDANTS"**) are acting as real estate brokers and agents, by inter alia, conducting and completing the Auction Program Activities on behalf of Plaintiffs and the class members.

159.   The Auction Program Activities require a California real estate license under Section 10131 of the California Business & Professions Code.

160.   LICENSEE DEFENDANTS undertook the Auction Program Activities on behalf of Plaintiffs and the class members in order to secure financial compensation in the form of a 5% fee or commission payable to XOME.

161.   Through the terms of the Program Letter and the Auction Program, and by the course of conduct between the parties, LICENSEE DEFENDANTS each owe a fiduciary duty of utmost care, integrity, honesty and undivided loyalty in all dealings with the Plaintiffs and the class members. LICENSEE DEFENDANTS also have a duty to exercise reasonable skill and care in performance of their duties as well as a duty to disclose all facts known to them materially affecting the value or desirability of the real estate involved or which would interfere with the performance of their duties in representing Plaintiffs and the class members. This fiduciary and confidential relationship was never repudiated by Plaintiffs or any class member at any time mentioned herein.

162.   LICENSEE DEFENDANTS each breached their fiduciary duty to Plaintiffs and the class members as follows:

a.   failing to properly and competently represent Plaintiffs and the class

39

**CLASS ACTION COMPLAINT**

members as described herein;

b. allowing unlicensed employees to conduct activities that require a real estate license;

c. acting as a real estate agent in the transaction without a valid listing agreement;

d. refusing to review, consider or submit Plaintiffs' and class members' original purchase contracts;

e. posting Plaintiffs' and class members' homes for sale without a valid listing agreement and using the postings as marketing for XOME'S private website;

f. soliciting buyers without a valid listing agreement;

g. failing to fully disclose all offers made on the subject properties to Plaintiffs and class members;

h. interfering with and delaying Plaintiffs' and the class members' loss mitigation process through the Auction Program;

i. interfering with Plaintiffs' and the class members' loss mitigation rights and legal rights under Regulation X of RESPA, California's Homeowner Bill of Rights (HBOR) and California's Home Equity Sales Contract Act (HESCA);

j. charging, collecting or attempting to collect real estate commissions without a valid written commission agreement;

k. charging and accepting a fee for the loss mitigation review in violation of Cal. Civ. Code § 2924.11.

l. disclosing confidential information about Plaintiffs and the class members to potential buyers without express permission of Plaintiffs or the class members, including, without limitation, Plaintiffs' and class members' financial position, motivations, bargaining position and other personal information including Plaintiffs' and class

**CLASS ACTION COMPLAINT**

members' willingness to accept a lower price than the listing price in violation of Cal. Civ. Code § 2079.21;

m. negotiating the price and related financial terms on behalf of both Plaintiffs and the class members, on the one hand, and potential buyers, on the other hand, without the express permission of Plaintiffs or the class members to represent such buyers in the proposed transactions.

n. failing to properly disclose LICENSEE DEFENDANTS' affiliated business arrangements with NATIONSTAR and COOPER and the associated costs, fees and terms associated with those affiliated business arrangements.

o. failing to disclose all documents, contracts and addenda associated with the purported sale of the subject properties;

p. failing to disclose known fees and charges as part of the proposed short sales;

q. taking unconscionable advantage of Plaintiffs and class members through the Auction Program while LICENSEE DEFENDANTS' affiliates processed foreclosures against Plaintiffs and the class members while concurrently ignoring Plaintiffs' and the class members' rights under RESPA, HBOR and HESCA so that LICENSEE DEFENDANTS could benefit financially to Plaintiffs' detriment.

163.  A ***duty of loyalty*** is one of the most fundamental fiduciary duties owed by an agent to his principal. This duty obligates a real estate broker to act at all times solely in the best interests of his principal to the exclusion of all other interests, including the broker's own self-interest. A corollary of this duty of loyalty is a ***duty to avoid any conflicts of interest*** that might compromise or dilute the broker's undivided loyalty to his principal's interests. Thus, a real estate broker's duty of

loyalty prohibits him from accepting employment from any person whose interests compete with, or are adverse to, his principal's interests.

164. XOME and NATIONSTAR are under common ownership and control by COOPER. In their role of mortgage servicer, NATIONSTAR and COOPER have a contractual relationship with the note holder/investor of the mortgage loan being serviced which includes fiduciary obligations to that client. NATIONSTAR and COOPER are engaged by note holders/investors to collect on loans against Plaintiffs and the class members and to process the active foreclosure against Plaintiffs and the class members and, thereafter, to evict Plaintiffs and the class members from their homes and possibly seek deficiency judgements.

165. Throughout the Auction Program, NATIONSTAR and COOPER controlled the foreclosure process, the loss mitigation process and, through XOME, also controlled the Property listing, marketing, contracting and sales process. However, by taking on the Auction Program Activities, LICENSEE DEFENDANTS entered into agency relationships with Plaintiffs and the class members and accepted known conflicting fiduciary duties to Plaintiffs and the class members with respect to their properties and the proposed short sales thereof.

166. Further, NATIONSTAR, COOPER and LICENSEE DEFENDANTS controlled the actions of Plaintiffs'/class members' real estate agents through the Auction Program such that the real estate agents lacked the ability to act independently and were unable to fulfill their own fiduciary obligations to Plaintiffs and the class members.

167. In taking the above actions, LICENSEE DEFENDANTS had numerous and significant unwaivable conflicts of interests.

168. LICENSEE DEFENDANTS breached their duty of undivided loyalty to Plaintiffs and the class members as follows:

        a. by coordinating activities with NATIONSTAR and COOPER during active foreclosure actions against Plaintiffs and class members while

concurrently representing Plaintiffs and class members as a licensed real estate broker in the proposed short sales by listing and marketing the homes, soliciting buyers, negotiating terms, drafting purchase contracts and addenda, collecting commissions on the sale of those properties, and requiring the use of the XOME form contracts and documents.

b. by coordinating with NATIONSTAR and COOPER in forcing Plaintiffs and the class members to use the services of XOME in the sale of the subject properties so that NATIONSTAR, COOPER and XOME could benefit financially by charging the XOME Processing Fees.

c. by having an undisclosed conflict of interest in the possible relisting and resale of Plaintiffs' and the class members' properties should those properties be foreclosed upon by NATIONSTAR and COOPER on behalf of their mortgage servicing clients. This undisclosed, potential secret profit created a conflict of interest in that NATIONSTAR, COOPER and XOME could make more money through the foreclosure of Plaintiffs' Property as compared to a successful short sale.

d. by refusing to consider the original purchase contracts which may have been much more beneficial to the homeowner. In taking such action, XOME was protecting the interests of COOPER and NATIONSTAR along with the interest of the mortgage servicing clients rather than the interests of the homeowners it represented.

e. by putting their personal interests and the interests of COOPER and NATIONSTAR ahead of the interests of their clients.

169.  As a proximate result of LICENSEE DEFENDANTS' breach of duties to Plaintiffs and the class members, Plaintiffs and the class members have been

damaged in an amount to be determined according to proof at trial. As a further proximate result of the LICENSEE DEFENDANTS' breach of duties, Plaintiffs and the class members were forced to retain legal counsel resulting in additional costs incurred by Plaintiffs and class members in an amount subject to proof.

170.   The above-alleged acts and omissions of LICENSEE DEFENDANTS were done with the intention of depriving Plaintiffs and the class members of property or legal rights or otherwise causing injury and is despicable conduct that subjected Plaintiffs and the class members to unjust hardship in conscious disregard of Plaintiffs' and the class members' rights. Such conduct was willful, oppressive, fraudulent, and malicious in that LICENSEE DEFENDANTS, and each of them, acted and/or failed to act with the intent to injure Plaintiffs and the class members and/or in conscious disregard of Plaintiffs' and the class members' rights. Plaintiffs and the class members are therefore entitled to punitive damages.

## THIRD CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY – CALIFORNIA CLASS

*(By Plaintiffs, individually and on behalf of the proposed California Class, Against COOPER, NATIONSTAR and DOES 1 - 50)*

171.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

172.   As alleged herein above, LICENSEE DEFENDANTS are acting as real estate brokers, by inter alia, conducting and completing the Auction Program Activities on behalf of Plaintiffs and the class members.  Therefore, LICENSEE DEFENDANTS owe a fiduciary duty to Plaintiffs and the class members.

173.   COOPER and NATIONSTAR knew of the fiduciary relationship between LICENSEE DEFENDANTS, on the one hand, and Plaintiffs and the class members, on the other hand.

174.   COOPER and NATIONSTAR required LICENSEE DEFENDANTS to

take the actions alleged herein which breached LICENSEE DEFENDANTS' fiduciary duties to Plaintiffs and the class members.

175.   COOPER and NATIONSTAR provided the method and means by which LICENSEE DEFENDANTS were able to breach their fiduciary duties to Plaintiffs and the class members.

176. COOPER and NATIONSTAR aided and abetted LICENSEE DEFENDANTS' breach of fiduciary duties to Plaintiffs and the class members.

177.   As a proximate result of COOPER'S and NATIONSTAR'S actions in aiding and abetting LICENSEE DEFENDANTS' breach of duties to Plaintiffs and the class members, Plaintiffs and the class members have been damaged in an amount to be determined according to proof at trial. As a further proximate result of COOPER'S and NATIONSTAR'S actions in aiding and abetting LICENSEE DEFENDANTS' breach of duties, Plaintiffs and the class members were forced to retain legal counsel resulting in additional costs incurred by Plaintiffs and class members in an amount subject to proof.

178.   The above-alleged acts and omissions of COOPER and NATIONSTAR in aiding and abetting LICENSEE DEFENDANTS were done with the intention of depriving Plaintiffs and the class members of property or legal rights or otherwise causing injury and is despicable conduct that subjected Plaintiffs and the class members to unjust hardship in conscious disregard of Plaintiffs' and the class members' rights. Such conduct was willful, oppressive, fraudulent, and malicious in that COOPER and NATIONSTAR acted and/or failed to act with the intent to injure Plaintiffs and the class members and/or in conscious disregard of Plaintiffs' and the class members' rights. Plaintiffs and the class members are therefore entitled to punitive damages.

**CLASS ACTION COMPLAINT**

**FOURTH CAUSE OF ACTION**

**NEGLIGENCE – NATIONWIDE CLASS**

*(By Plaintiffs, individually and on behalf of the proposed Nationwide Class*

*Against XOME and DOES 1 through 50)*

179.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

180.   At all times during the Auction Program, XOME was acting in the capacity as a real estate agent and broker, as set forth above.

181.   XOME owed a duty to Plaintiffs and class members to diligently exercise reasonable skill and care in performance of XOME'S duties to Plaintiffs and class members as their real estate agent and broker.

182.   XOME breached that duty by engaging in the conduct herein alleged.

183.   As an actual and proximate cause of XOME'S breach, Plaintiffs and class members have suffered damage in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**NEGLIGENCE - CALIFORNIA CLASS**

*(By Plaintiffs, individually and on behalf of the proposed California Class*

*Against XOME, SIMMONS, O'LEARY and DOES 1-50)*

184.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

185.   At all times during the Auction Program, XOME, SIMMONS, and O'LEARY were acting in the capacity as a real estate agent and broker, as set forth above.

186.   XOME, SIMMONS, and O'LEARY owed a duty to Plaintiffs and class members to diligently exercise reasonable skill and care in performance of their duties to Plaintiffs and class members as their real estate agents and brokers.

187.   XOME, SIMMONS, and O'LEARY breached that duty by engaging in the conduct herein alleged.

**CLASS ACTION COMPLAINT**

188.   As an actual and proximate cause of the breach by XOME, SIMMONS, and O'LEARY, Plaintiffs and class members have suffered damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

## INTENTIONAL MISREPRESENTATION – CALIFORNIA CLASS

### *(By Plaintiffs, individually and on behalf of the proposed California Class Against NATIONSTAR and DOES 1-50)*

189.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

190.   NATIONSTAR represented to Plaintiffs and the Class Members that participation in the Auction Program was required if Plaintiffs and Class Members wished to have a loss mitigation review pursuant to a short sale.

191.   This representation was false. NATIONSTAR knew at the time of the misrepresentation that Plaintiffs and Class Members had a legal right to a loss mitigation review without participation in, the Auction Program.

192.   Plaintiffs and the Class Members reasonably relied on the representations of NATIONSTAR. The reliance was a substantial factor in causing damage to Plaintiff and the Class Members, who have suffered damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS – CALIFORNIA CLASS

### *(By Plaintiffs, individually and on behalf of the proposed California Class Against NATIONSTAR, XOME and DOES 1-50)*

193.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

194.   Plaintiffs and the class members had valid, outstanding contracts with their selected real estate agents.

195.   NATIONSTAR and XOME knew of the valid, outstanding contracts between said Plaintiffs and class members, on the one hand, and the real estate agents, on the other hand.

196.   NATIONSTAR and XOME directly and intentionally interfere with those contracts.

197. NATIONSTAR and XOME knew that the mandatory Terms and Conditions of the Auction Program made it so that disruption of performance of the exclusive listing agreements was certain, or substantially certain, to occur.

198.   As a result of said Defendants' conduct, Plaintiffs and class members were harmed as they lost the opportunity to market and sell their home with the real estate agent of their choosing and lost the protections afforded by having their real estate agent protect their interest without conflicts of interest.

199.   Plaintiffs and the class members were damaged in an amount to be proven at trial.

200.   Because Plaintiffs and the class members allege that this disruption of the contractual relationship was intentional, and in conscious disregard of Plaintiffs' and class members' rights, punitive damages are available and are being sought according to proof at trial.

## EIGHTH CAUSE OF ACTION

### VIOLATIONS OF 12 U.S.C. § 2607 – NATIONWIDE CLASS

*(By Plaintiffs, individually and on behalf of the proposed Nationwide Class,*

*Against COOPER, NATIONSTAR, XOME and DOES 1 - 50)*

201.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

202.   The Real Estate Settlement Procedures Act of 1974 ("**RESPA**") was enacted to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices" in mortgage lending. *See* 12 U.S.C. § 2601(a). Specifically, § 8(a) of RESPA prohibits giving or accepting "any fee, kickback, or

thing of value pursuant to any agreement or understanding, oral or otherwise, [in relation to the referral of] a real estate settlement service involving a federally related mortgage loan." Real Estate Settlement Procedures Act § 8, 12 U.S.C. § 2607. Section 8 also prohibits certain fee splitting, unearned fees and non-disclosed affiliated business arrangements. *Id.*  Thus, a primary purpose of RESPA is to eliminate such costs and fees that unnecessarily increase the costs of real estate settlement services. 12 U.S.C. 2601(b)(2).  The law was amended in 1990 to cover persons responsible for servicing federally-related mortgage loans and imposed certain obligations on servicers such as NATIONSTAR.

203. Any applicable statutes of limitations have been tolled by DEFENDANTS' illegal, unfair and deceptive practices. DEFENDANTS have concealed from Plaintiffs and the class members the truth about their illegal, unfair and deceptive practices described herein, thereby tolling the running of the applicable statutes of limitations.

204. Plaintiffs and the class members could not have reasonably discovered DEFENDANTS' illegal, unfair and deceptive practices as alleged herein until recently. DEFENDANTS are estopped from relying on any statute of limitations defense because of their illegal, unfair and deceptive practices as alleged herein. Until shortly before filing this Complaint, Plaintiffs and the class members had no knowledge that DEFENDANTS had engaged in the illegal, unfair or deceptive practices described in this Complaint.

205. By referring real estate brokerage, real estate auction, real estate valuation and real estate contracting services to XOME (1) without properly disclosing the affiliated business relationship; (2) without providing a written estimate of the charge or range of charges made by DEFENDANTS; and (3) without disclosing that consumers are not required to use any particular provider of such services, DEFENDANTS have engaged and continue to engage in the practice of making illegal business referrals for the rendering of real estate settlement services in

violation of 12 U.S.C. § 2607(a)-(c) and Regulation X of RESPA.

206.   By requiring Plaintiffs and class members to use XOME for the above referenced real estate settlement services, DEFENDANTS have engaged and continue to engage in the practice of requiring the use of a real estate settlement service provider in violation of 12 U.S.C. § 2607(a)-(c), and Regulation X of RESPA.

207.   By charging loss mitigation processing fees and commissions that are paid to an affiliated company that are unnecessary and duplicative, DEFENDANTS have engaged and continue to engage in the practice of making a payment that bears no reasonable relationship to the market value of the services provided and is not for services actually performed or provided in violation of 12 U.S.C. § 2607(a)-(c) and Regulation X of RESPA.

208.   By receiving a payment for "multiple services," as that term is used in Regulation X, which are not actual, necessary and distinct from the primary services provided, DEFENDANTS have violated 12 U.S.C. § 2607, and Regulation X of RESPA.

209.   COOPER received, directly or indirectly, kickbacks and unearned fees by sharing and/or receiving portions of the above referenced costs, fees and commissions in violation of 12 U.S.C. § 2607 and Regulation X of RESPA.

210.   XOME had no statutory or contractual right to perform any of the settlement services referenced herein and, therefore, any fees charged or collected for those services is a violation of 12 U.S.C. § 2607 and Regulation X of RESPA.

211.   Plaintiffs and class members were already under contract with licensed real estate agents and brokers to perform the services alleged to be necessary by the Auction Program.   The settlement services purportedly provided by XOME as a requirement of DEFENDANTS loss mitigation practices were unnecessary, duplicative and constitute unearned fees in violation of 12 U.S.C. § 2607 and Regulation X of RESPA.

212.   Whether Plaintiffs or the class members have actually paid any such costs or fees which were assessed by DEFENDANTS is irrelevant to the damages analysis. Numerous courts have held that assessed fees can constitute damages under RESPA, even if Plaintiffs or the class members have not paid them.

213.   Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the class members are entitled to statutory damages for DEFENDANTS' violations of 12 U.S.C. § 2607 in an amount equal to three times the amount of the costs, fees and commissions charged and involved in DEFENDANTS' violations.

214.   Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the class members are entitled to the court costs of the action together with reasonable attorney's fees.

## NINTH CAUSE OF ACTION

### VIOLATIONS OF REGULATION X – NATIONWIDE CLASS

*(By Plaintiffs, individually and on behalf of the proposed Nationwide Class,*

*Against NATIONSTAR, XOME and DOES 1 - 50)*

215.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

### Violations of  12 C.F.R. § 1024.40

216.   Pursuant to 12 C.F.R. § 1024.40, NATIONSTAR was required to designate a point of contact (a *"POC"*) to Plaintiffs' and the class members' file within 45 days of the first missed payment and to make such POC available to Plaintiffs and the class members via telephone.  The POC was required to provide Plaintiffs and the class members with accurate information about the loss mitigation options available and the actions required to be evaluated for such loss mitigation. The POC was required to provide Plaintiffs and the class members with accurate information about the status of any loss mitigation application that was submitted to NATIONSTAR.

217.   By turning over the entire loss mitigation process to XOME through the Auction Program and the XOME website, NATIONSTAR violated 12 C.F.R. §

1024.40 by failing to provide Plaintiffs and the class members a means of contacting a POC and by failing to require a POC to make timely contact with Plaintiffs and the class members regarding the status of their loss mitigation requests.  DEFENDANTS had random employees from XOME make contact with Plaintiffs and the class members and/or had unidentified persons mail notices to Plaintiffs and the class members regarding the loss mitigation process.

## Violations of 12 C.F.R. § 1024.41(b)

218.  By sending the Program Letter and ignoring the valid short sale offers from Plaintiffs and class members, NATIONSTAR violated 12 C.F.R. § 1024.41(b) by failing to notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete.

## Violation of § 1024.41(c)

219.  By requiring use of XOME and the Auction Program to delay the loss mitigation process, NATIONSTAR violated 12 C.F.R. § 1024.41(c), by failing, within 30 days of receiving a Plaintiffs' and class members' loss mitigation requests pursuant to the short sales, to (i) evaluate the borrower for all loss mitigation options available to the borrower and (ii) provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. NATIONSTAR failed to include in any such notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program or the right to appeal any denial of such program.

220.  NATIONSTAR'S violations of Regulation X were prejudicial and harmful to Plaintiffs and the class members because those violations:

        a.     deprived Plaintiffs and the class members of the rights and

protections under RESPA.

b.   deprived Plaintiffs and the class members of a reasonable opportunity to be reviewed and evaluated for all available loss mitigation options.

c.   deprived Plaintiffs and the class members of any opportunity to prevent the completion of the foreclosure proceedings against their home.

d.   prevented Plaintiffs and the class members from reasonably assessing their situation and avoiding foreclosure at pivotal times when such information would have made a difference.

e.   substantially, unnecessarily and unreasonably delayed the loss mitigation process which exposed Plaintiffs and the class members to additional costs and fees and facilitated the commencement of foreclosure proceedings which further escalated the costs and fees charged by NATIONSTAR.

221.   As a result of NATIONSTAR'S violations of Regulation X, Plaintiffs and class members have suffered actual damages as follows:

a.   Plaintiffs and the class members were unable to secure appropriate loss mitigation and foreclosure prevention options and were assessed ongoing, unnecessary, and, in some cases, illegal late fees, foreclosure costs, foreclosure attorney fees and other costs and fees charged by NATIONSTAR and XOME.

b.   Plaintiffs' and the class members' homes were illegally foreclosed upon so that NATIONSTAR and XOME would have an opportunity to list and sell REO assets on behalf of their mortgage servicing clients.

c.   Plaintiffs and the class members expended considerable time, energy, effort and money pursuing the loss mitigation process and

complying with NATIONSTAR'S and XOME'S demands to produce documents which were either lost or ignored.

d.   Plaintiffs and the class members expended time and money preparing their financial information for their loss mitigation request and the sale of the subject properties, as well as considerable time and effort preparing, providing, and vouching for the truth of their financial information and making repeated copies of documents, coordinating with their banks for documents, which would have been minimized or avoided had NATIONSTAR complied with Regulation X.

e.   Plaintiffs and the class members were forced to incur illegal Processing Fees had NATIONSTAR complied with Regulation X.

f.   Plaintiffs and the class members were forced to incur administrative costs such as postage, travel expenses, photocopying, scanning, and facsimile expenses pursuing the loss mitigation process, which they would not have incurred if NATIONSTAR had complied with Regulation X. NATIONSTAR'S violations of Regulation X have unreasonably and improperly increased the time, energy, effort and money required by Plaintiffs and class members in pursuing the loss mitigation process.

g.   Plaintiffs have also suffered emotional damages in the form of fear and anxiety resulting from the continual threat of foreclosure and eviction resulting from NATIONSTAR'S violations of Regulation X.

h.   Plaintiffs and class members have expended money in seeking legal redress as well in order to protect their real property rights

pursuant to RESPA.

222.   Plaintiffs and the class members allege that DEFENDANTS' conduct in this case constitutes a willful violation of the applicable provisions of Regulation X of RESPA.   As a result of DEFENDANTS' actions in violation of RESPA, DEFENDANTS are liable to Plaintiffs and the class members for actual damages, statutory damages, costs, and attorney's fees.

## TENTH CAUSE OF ACTION

## VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT – NATIONWIDE CLASS

### *(By Plaintiffs, individually and on behalf of the proposed Nationwide Class Against NATIONSTAR and DOES 1-50)*

223.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

224.   The Federal Fair Debt Collection Practices Act (***"FDCPA"***), 15 U.S.C. §§ 1692 *et. seq.*, prohibits the use of false, deceptive, misleading, harassing, abusive and offensive conduct by debt collectors during collection of consumer debts.

225.   Plaintiffs and class members are natural persons and "consumers" as defined under 15 U.S.C. § 1692a(3).

226.   The obligation between the parties is a "debt" owed as defined under 15 U.S.C. § 1692a(5) pursuant to the subject note and deed of trust.

227. NATIONSTAR is a "debt collector" as defined under 15 U.S.C. § 1692a(6), as NATIONSTAR regularly attempts to collect debts owed to others through its mortgage servicing division.

228.   NATIONSTAR has engaged in acts or omissions prohibited by the FDCPA.

229.   A claim under the FDCPA is evaluated from the perspective of the least sophisticated consumer regardless of whether the consumer is represented by counsel.

## **Violations of 15 U.S.C. § 1692e**

230.   Pursuant to 15 U.S.C. § 1692e, a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. This prohibition includes any false representations about "the character, amount, or legal status of any debt" along with any representation or implication that nonpayment of any debt will result in sale of any property of any person unless such action is lawful.

231. NATIONSTAR violated 15 U.S.C. § 1692e(2)(B), by falsely representing that Plaintiffs and class members were required to participate in the Auction Program in order to have their valid loss mitigation requests properly reviewed and considered by NATIONSTAR.

232. NATIONSTAR violated 15 U.S.C. § 1692e(2)(B), by falsely representing that Plaintiffs and class members were required to use XOME as part of the Auction Program in order to have their valid loss mitigation request reviewed and considered by NATIONSTAR.

233. NATIONSTAR violated 15 U.S.C. § 1692e(2)(B), by falsely representing that Plaintiffs and class members were required to pay the XOME Processing Fees as part of their loss mitigation requests and as part of the settlement of the mortgage debt being collected by NATIONSTAR.

234.   NATIONSTAR violated 15 U.S.C. § 1692e(5), by threatening to take an action (i.e., refusing to review valid and lawful loss mitigation requests as set forth above) against Plaintiffs and class members when NATIONSTAR knew that such action was in violation of state and federal law.

235. NATIONSTAR violated 15 U.S.C. § 1692e(10) by using a false representation and deceptive means to collect and/or attempt to collect additional amounts above what was owed by Plaintiffs and class members by improperly forcing Plaintiffs and class members to use XOME as part of the Auction Program. Neither Plaintiffs nor any class members were contractually required to pay the

Xome Processing Fee as part of the debt being collected by NATIONSTAR.

236.   NATIONSTAR violated 15 U.S.C. § 1692e(14) by using XOME as a ruse to collect additional servicing fees from Plaintiffs and class members that were otherwise prohibited by state and federal law and for which Plaintiffs and class members had no contractual obligation.

**Violations of 15 U.S.C. § 1692f**

237.   Pursuant to 15 U.S.C. § 1692f, a debt collector may not use "unfair or unconscionable means to collect or attempt to collect any debt."

238.   NATIONSTAR violated 15 U.S.C. § 1692f(1) by collecting and attempting to collect an amount, to wit, the XOME Processing Fees, which included fees, charges and expenses incidental to the principal obligation which NATIONSTAR knew was neither expressly authorized by the agreement creating the debt nor permitted by law.

239.   As a result of the foregoing violations, NATIONSTAR is liable for statutory damages, in an amount to be determined at trial, but not less than $1,000 per violation, pursuant to 15 USC § 1692k(a)(2)(A) or, in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

240.   Plaintiffs and the class members have suffered actual damages as the proximate and actual cause and result of the violations of the FDCPA by NATIONSTAR to be determined at trial.

241.   As a result of the foregoing violations, NATIONSTAR should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the FDCPA alleged herein or proven at trial.

242.   As a result of NATIONSTAR'S violations of the FDCPA, Plaintiffs and the class members are entitled to actual and statutory damages, attorney's fees, and costs, and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA ROSENTHAL ACT – CALIFORNIA CLASS**

***(By Plaintiffs, individually and on behalf of the proposed California Class, Against NATIONSTAR and DOES 1-50)***

243.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

244.   As alleged herein, and as set forth in detail above, NATIONSTAR has committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code § 1788, et seq. (***"Rosenthal Act"***), which incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.  The FDCPA and, therefore, the Rosenthal Act, prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692(e).

245.   NATIONSTAR is a "debt collector" within the meaning of California Civil Code § 1788.2(c) because NATIONSTAR conducted debt collection activities on Plaintiffs' and the class members' "consumer debt."   Plaintiffs and the class members are entitled to the protections of Cal. Civ. Code §§ 1788 et seq. with respect to NATIONSTAR'S collection activities related to Plaintiffs' and class members' mortgage loans which are serviced by NATIONSTAR.

246.   NATIONSTAR, through its agents, engaged in unfair and deceptive collection practices in contravention to the Rosenthal Act. NATIONSTAR'S actions alleged herein constitute violations of Cal. Civ. Code § 1788.17.

247.   Plaintiffs and the class members have suffered actual damages as the

proximate and actual cause and result of the violations of the Rosenthal Act by NATIONSTAR to be determined at trial.

248.   As a proximate result of NATIONSTAR'S violations of the Rosenthal Act, NATIONSTAR is liable for actual and statutory damages, including general damages and special damages, attorney's fees, and costs, and any other such relief the Court deems just and proper and in amounts to be determined at trial pursuant to Cal. Civ. Code §§ 1788.17 and 1788.30(a).

249.   Additionally, because NATIONSTAR'S violations of the Rosenthal Act were committed willingly and knowingly, Plaintiffs and the class members are entitled to recover penalties of up to $1,000 per violation as provided for in the Rosenthal Act.

250.   As a result of the foregoing violations, NATIONSTAR should be enjoined from employing any of the unlawful conduct, methods, acts, or practices under the Rosenthal Act alleged herein or proven at trial.

## TWELVETH CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA'S HOMEOWNER BILL OF RIGHTS – CALIFORNIA CLASS

### (By Plaintiffs, individually and on behalf of the proposed California Class, Against NATIONSTAR and DOES 1 - 50)

251.   Plaintiffs re-allege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

### Violation of § 2923.7

252.   HBOR specifically requires that upon a request for a "foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact and provide to the borrower one or more direct means of communicating with the single point of contact" and that "[t]he single point of contact shall remain assigned to the borrower's account until the mortgage servicer determines that all loss mitigation options offered by, or through, the mortgage servicer have been

1   exhausted or the borrower's account becomes current." Cal. Civ. Code § 2923.7.

2   253.   Plaintiffs and the class members requested a foreclosure prevention

3   alternative from NATIONSTAR in the form of a short sale (as recognized by HBOR)

4   which NATIONSTAR acknowledged.  Therefore, Plaitniffs and the class members

5   were entitled to the protections afforded by assignment of a single point of contact (a

6   **"SPOC"**).

7   254.   Plaintiffs and the class members are informed and believe, and thereon

8   allege, that once a homeowner enters the Auction Program, NATIONSTAR turns

9   over all short sale communications to XOME, including all loss mitigation

10  processing.  This pattern and practice of delegating all loss mitigation duties to

11  XOME and its employees violates NATIONSTAR'S duty to maintain a single point

12  of contact.

13  255.   NATIONSTAR violated Cal. Civ. Code § 2923.7(a), by turning over all

14  loss mitigation processing to XOME and, thereafter, failing to provide Plaintiffs and

15  the class members one or more direct means of communicating with the single point

16  of contact.

17  256.   NATIONSTAR violated Cal. Civ. Code § 2923.7(c), by turning over all

18  loss mitigation processing to XOME and, thereafter, failing to keep a single point of

19  contact assigned to Plaintiffs' and the class members' accounts until NATIONSTAR

20  determines that all loss mitigation options offered by, or through, the mortgage

21  servicer have been exhausted or the Plaintiffs' or class members' accounts become

22  current.

23  257.   NATIONSTAR violated Cal. Civ. Code § 2923.7(b), by turning over all

24  loss mitigation processing to XOME and, thereafter, assigning non-SPOC employees

25  to Plaintiffs' and the class members' loss mitigation requests who:

26          a.  Failed to communicate the process by which Plaintiffs/class

27              members may apply for an available foreclosure prevention

28              alternative and the deadline for any required submissions to be

considered for these options.

    b.  Failed to coordinate receipt of all documents associated with available foreclosure prevention alternatives and notify Plaintiffs/class members of any missing documents necessary to complete the application.

    c.  Failed to have access to current information and personnel sufficient to timely, accurately, and adequately inform Plaintiffs/class members of the current status of the foreclosure prevention alternative.

    d.  Failed to ensure that Plaintiffs/class members were considered for all foreclosure prevention alternatives offered by, or through, the mortgage servicer, if any.

    e.  Failed to have access to individuals with the ability and authority to stop foreclosure proceedings when necessary.

258.   As a result of NATIONSTAR'S violations of § 2923.7 alleged above, Plaintiffs and the class members were illegally dual tracked which resulted in the illegal commencement of foreclosure actions and the recording of illegal foreclosure notices.

259.   Further, NATIONSTAR'S violations of § 2923.7 resulted in significant costs and fees charged to Plaintiffs' and the class members' mortgages, including, without limitation, late fees, foreclosure filing fees, inspection fees, foreclosure attorney and trustee fees, and illegal XOME processing fees and commissions.

260.   Further, NATIONSTAR'S violations of § 2923.7 resulted in Plaintiffs and the class members incurring additional out-of-pocket costs for responding to the erroneous demands from XOME employees, including, without limitation, printing, scanning, faxing, mailing and travel costs associated with redundant and unnecessary document production.

## **<u>Violation of § 2924.11</u>**

261.   HBOR specifically prohibits the mortgage servicer from charging "any

application, processing, or other fee for a first lien loan modification or other foreclosure prevention alternative." Cal. Civ. Code § 2924.11(e).

262.   NATIONSTAR requires the use of XOME in the processing of the short sale as a foreclosure prevention alternative as part of the Auction Program and, as part of that program, NATIONSTAR charges the XOME Processing Fee.

263.   Plaintiffs are informed and believe, and thereon allege, that NATIONSTAR established the Auction Program in order to circumvent the HBOR prohibition on charging processing fees as part of the loss mitigation process.  As alleged herein, the Auction Program activities are unnecessary and duplicative of the real estate licensed activities undertaken by Plaintiffs' and class members' real estate agents and brokers.   Therefore, the XOME Processing Fee is unearned and constitutes nothing more than an illegal processing fee under HBOR.

**Harm to Plaintiffs and the Class Members**

264.   NATIONSTAR has violated the Homeowner Bill of Rights by, among other things, engaging in the conduct alleged herein. Plaintiffs, and all other class members, are accordingly entitled to damages, and attorney's fees and costs. Plaintiffs further allege that NATIONSTAR'S violation of these provisions of the Homeowner Bill of Rights was intentional or reckless and was also willful which makes NATIONSTAR liable to Plaintiffs, and all other class members, for treble actual damages, or $50,000, whichever is greater.

265.   Based upon these material violations of HBOR, Plaintiffs and class members who still retain ownership of their homes are also entitled to an injunction under Cal. Civ. Code § 2924.12 stopping any further foreclosure action against any subject properties and an award for attorney's fees and costs.  Plaintiffs and the class members further allege that NATIONSTAR'S violation of these provisions of the HBOR was knowing, malicious, willful and reckless.

## THIRTEENTH CAUSE OF ACTION

**UNFAIR PRACTICES UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ.**

***(By Plaintiffs, individually and on behalf of the proposed California Class***

***Against All Defendants and DOES 1-50)***

266.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

267.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

268.   A business practice is "unlawful" if it violates any established state or federal law.

269.   As alleged herein above, DEFENDANTS have violated the following state and federal laws:

  a.  12 U.S.C. § 2607

  b.  12 C.F.R. § 1024.40

  c.  12 C.F.R. § 1024.41

  d.  15 U.S.C. § 1692e

  e.  15 U.S.C. § 1692f

  f.  Cal. Civ. Code § 2079.21

  g.  Cal. Civ. Code § 1695, et seq.

  h.  Cal. Civ. Code § 2923.7

  i.  Cal. Civ. Code § 2924.11

  j.  Cal. Civ. Code § 1788, et seq.

270.   DEFENDANTS' conduct as described herein violates not only the unlawful prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong, independent of the other causes of action asserted herein.  DEFENDANTS' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous

and substantially injurious to consumers. Any justification for DEFENDANTS' practices is outweighed by the consequences and harm to Plaintiffs and the class members.  As alleged herein above, DEFENDANTS have engaged in the following unfair acts against Plaintiffs and class members (collectively, *"HOMEOWNERS"*) in violation of Business and Professions Code section 17200:

- COOPER and NATIONSTAR use (a) their position of power over HOMEOWNERS as a mortgage servicer and debt collector, (b) their superior knowledge of, and control over, the loss mitigation and foreclosure process, and (c) confidential financial information about distressed HOMEOWNERS in mortgage default in order to force those HOMEOWNERS to use the real estate settlement services of XOME which is owned by COOPER and controlled by NATIONSTAR in order to charge unnecessary, unreasonable, duplicative and illegal fees to the short sale of the HOMEOWNERS' personal residences during the loss mitigation process.

- DEFENDANTS force the AUCTION PROGRAM and the XOME services onto those HOMEOWNERS who are under NATIONSTAR'S control on terms that are substantially different and more restrictive than those services that are offered to the general public.  HOMEOWNERS who are forced into the program are not given the same protections and rights as the general public who participate in XOME'S auction platform and HOMEOWNERS are charged more for the same services which are offered to the general public.

- DEFENDANTS violate Cal. Bus. & Prof. Code § 17046 by using threats and intimidation to effectuate the above referenced violations of California law.   By refusing to review valid loss mitigation requests and short sale offers submitted by HOMEOWNERS,

DEFENDANTS are able to use the threat of foreclosure, eviction and deficiency judgments to force HOMEOWNERS to agree to the AUCTION PROGRAM and payment of the XOME Processing Fees on terms to which a reasonably prudent consumer would not otherwise agree. DEFENDANTS use different contracts with more restrictive terms for HOMEOWNERS who are forced into the program as compared to the contracts used with the general public.

- DEFENDANTS fail to properly and fully disclose the affiliated business arrangement that is created by the AUCTION PROGRAM and refuse to allow HOMEOWNERS to use other similar services that are available to the general public on market terms.

- NATIONSTAR shares confidential financial information about HOMEOWNERS with unnecessary third parties such as XOME employees and then uses it to force HOMEOWNERS into the AUCTION PROGRAM.

- DEFENDANTS set a value and 'reserve price' on the HOMEOWNERS' residences as part of the AUCTION PROGRAM but refuse to disclose this information which would assist HOMEOWNERS and their real estate agents/brokers in the successful loss mitigation efforts. DEFENDANTS use this secreting of information to further control HOMEOWNERS during the AUCTION PROGRAM and limit the choices and options of HOMEOWNERS as consumers of financial services "offered" by DEFENDANTS. In addition to Plaintiffs' and class members' right to receive this material information from DEFENDANTS as their fiduciary, Plaintiffs and class members believe and allege that DEFENDANTS are also required to produce all valuations, such as the reserve price, pursuant to the Valuations Rule under the Equal

Credit Opportunity Act and Regulation B.

- DEFENDANTS use the photographs and the availability of HOMEOWNERS' residences as marketing for the XOME platform and the auction programs it offers to the general public without permission from or compensation to the HOMEOWNERS.  These marketing efforts and activities would not be available to DEFENDANTS but for the DEFENDANTS actions in forcing HOMEOWNERS into the AUCTION PROGRAM through intimidation and threats.

- NATIONSTAR represents the conflicting interests of the foreclosing mortgage holder while concurrently forcing HOMEOWNERS into the AUCTION PROGRAM and into a contractual and fiduciary relationship with XOME.   DEFENDANTS have unwaivable conflicts of interest.

- DEFENDANTS have undisclosed financial interests in the post-foreclosure listing and sale of HOMEOWNERS' residences (which might become REO assets) which negatively affect NATIONSTAR'S obligations to properly process loss mitigation requests and which interfere with the short sale process by forcing HOMEOWNERS into the AUCTION PROGRAM such that DEFENDANTS control the entire process and the potential outcomes.

- DEFENDANTS force HOMEOWNERS to cancel and terminate valid purchase offer contracts from potential buyers secured by HOMEOWNERS' real estate agents/brokers which exposes HOMEOWNERS to legal liability and further delays in the loss mitigation process.   These factors increase the likelihood of foreclosure as mortgage balances increase and other liens and

encumbrances which much be addressed in the short sale become more burdensome.

- DEFENDANTS force the real estate agents/brokers which were hired by HOMEOWNERS to enter into the AUCTION PROGRAM. DEFENDANTS then exercise control and dominion over those agents/brokers by taking over the listing, marketing and sale process of HOMEOWNERS' residences. These agents/brokers can no longer meet their fiduciary obligations to the HOMEOWNERS based upon the AUCTION PROGRAM requirements which are totally controlled by DEFENDANTS.

- DEFENDANTS negotiate and draft all the purchase and sale documents which are part of the AUCTION PROGRAM. HOMEOWNERS are presented with take-it-or-leave-it terms (contracts of adhesion) under the threat of foreclosure if the HOMEOWNERS object. These contract terms include various non-standard calculations of real estate commissions and closing costs along with the XOME Processing Fees. DEFENDANTS are not attorneys and they do not represent HOMEOWNERS as legal counsel, yet they prepare legally binding contracts and do not allow HOMEOWNERS to have those contract reviewed by counsel or to even suggest changes or revisions.

- DEFENDANTS conduct all negotiations with potential buyers from the AUCTION PROGRAM. HOMEOWNERS, as the owners and sellers of the residences, are not allowed to propose terms or to suggest revisions whatsoever. HOMEOWNERS and their real estate agents/brokers lose all their legal rights to contracting under state law by being forced into the AUCTION PROGRAM.

- DEFENDANTS are using the AUCTION PROGRAM to collect fees

**CLASS ACTION COMPLAINT**

and commissions without having a valid listing contract with the HOMEOWNERS and without accepting any fiduciary responsibility for the actions undertaken as part of the AUCTION PROGRAM.

- DEFENDANTS charge or attempt to charge a "processing or other fee for a […] foreclosure prevention alternative" in violation of Cal. Civ. Code § 2924.11(e) by forcing HOMEOWNER into the AUCTION PROGRAM.

- DEFENDANTS artificially and improperly increase the closing costs of the subject transactions by adding an unnecessary, unreasonable, duplicative and illegal fee (the XOME Processing Fee) equal to 5% of the total sales price of the HOMEOWNERS' residences. Any increase in the costs of the transaction has a negative effect on the marketability of the home. By forcing HOMEOWNERS into the AUCTION PROGRAM and subjecting their sale transactions to the XOME Processing Fees, DEFENDANTS reduce the value of the real estate asset and increase the chance of a failed transaction (lower asset value equals lower net payment to the LENDER).

- By forcing payment of the XOME Processing Fees, DEFENDANTS take money from the sales transaction which could have been paid to HOMEOWNERS' mortgage holders in settling the default through short sale. DEFENDANTS' actions significantly increase the likelihood that the short sale will fail and that the HOMEOWNERS will end up losing their homes to foreclosure (and, concurrently, increase the likelihood that XOME will profit by listing and selling the REO asset on behalf of the mortgage holder). Further, the added XOME Processing Fee increases the net loss on the mortgage payoff and, thereby, increases the HOMEOWNERS' exposure to deficiency liability and/or cancellation of debt taxation.

**CLASS ACTION COMPLAINT**

- DEFENDANTS' Processing Fee negatively affects the Net Present Value calculation and increases the chance of rejection of the Homeowners' short sale request, leaving the Lender with foreclosure as the only option.  Had DEFENDANTS not interfered with the Listing Agreements through imposition of the Auction Program and charging the Processing Fee, the loss severity would be lower and short sale approval would be more likely.

- DEFENDANTS' mandatory 5% Processing Fee improperly diverts buyers' funds and the proceeds of the sale of the Property to DEFENDANTS which would otherwise be used to satisfy or settle other liens and encumbrances such as second mortgages, taxes, association dues and other third-party costs which must be settled in order to complete a successful short sale.

- DEFENDANTS' interference with the short sale results in HOMEOWNERS' (and their real estate agents') inability to negotiate with potential buyers on price and on terms of the short sale which would include, without limitation, allocation of funds for settlement of liens and encumbrances in the short sale such as second mortgages, taxes, association dues and other third-party costs which the Lender typically will not pay through the closing process but which must be paid to complete the short sale successfully.

- Plaintiffs and the class members are informed and believe and based thereon allege that Lender would not typically allow a 5% Processing Fee to be paid to anyone in any short sale and that Lender is only allowing the Processing Fee in the case at hand because of various undisclosed agreements with its fiduciary, NATIONSTAR, in the subject transaction.

- Lender's preference to DEFENDANTS in allowing DEFENDANTS

**CLASS ACTION COMPLAINT**

to charge a 5% Processing Fee, and DEFENDANTS' collection of said fee, while denying other third-party costs and fees, such as closing costs, association dues, etc. is an unfair business practice that negatively interferes with the Homeowners' rights to a foreclosure prevention alternative.

- DEFENDANTS' exclusive control over the marketing, sales, negotiation and contracting processes, along with the advertisement of the Homes on a distressed property auction website and the imposition of the 5% Processing Fee upon the potential buyers, significantly diminishes the value of the Homes and impairs the marketability of the Homes to potential buyers, all of whom had to register on DEFENDANTS' auction website, be approved to make public bids, and agree to stringent terms and conditions controlled by DEFENDANTS including payment of the substantial Processing Fee, all of which would not be present had DEFENDANTS not forced HOMEOWNERS into the AUCTION PROGRAM.

- DEFENDANTS' mandatory 5% Processing Fee along with DEFENDANTS' marketing the Homes on a distressed property auction website has the effect of dissuading owner-occupant buyers altogether and attracting bottom-feeding investors, which has the effect of lowering the value of the Homes and reducing the quantity and value of potential offers. The reduced value and the resulting reduced offer amounts make potential failure of the short sale more likely which, in turn, makes the foreclosure more probable.

- In situations where the short sale was completed via the AUCTION PROGRAM, DEFENDANTS' use of the AUCTION PROGRAM reduced the net proceeds available to HOMEOWNERS' mortgage holders by increasing the total costs and fees to be paid in the short

sale transaction which increases the potential for deficiency and/or cancellation of debt taxation.

- In all situations, DEFENDANTS' use of the AUCTION PROGRAM delayed resolution of HOMEOWNERS' mortgage default which increased the costs and fees charged to HOMEOWNERS seeking loss mitigation which, in turn, increased the potential deficiency and/or cancellation of debt taxation.

271. DEFENDANTS' conduct as described herein violates not only the unlawful and unfair prongs of the UCL, but it is also deceptive in failing to properly disclose affiliation, ownership and sharing of fees between COOPER, NATIONSTAR and XOME along with failing to disclose DEFENDANTS' financial interest in listing and selling REO assets, post-foreclosure.

272. Defendants' acts, omissions, misrepresentations, customs, practices and non-disclosures as set forth in this Complaint, whether or not in violation of any law, are otherwise unfair, unconscionable, unlawful and fraudulent.

273. Plaintiffs and class members have been injured and harmed directly by the acts of DEFENDANTS, and each of them, committed in violation of Business and Professions Code Section 17200. As a result, Plaintiffs and class members have suffered actual harm and damage.

274. Plaintiff are informed and believe, and on that basis allege, that DEFENDANTS' unlawful, unfair and/or deceptive business practices, alleged above, are continuing in nature and are widespread and present an ongoing threat of continuing injury to Plaintiffs, the class members and the general public. Among other things, Plaintiffs, the class members and the general public continue to be financially disadvantaged by such conduct. Such wrongful conduct is continuing and, unless DEFENDANTS are restrained, they will continue to engage in such conduct.

275. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the class members, individually and on behalf of the public, seek an order of this Court

enjoining DEFENDANTS from continuing their unfair, unlawful, and/or deceptive business acts or practices in the State of California and elsewhere. The public, Plaintiffs and the class members will be irreparably harmed if such an order is not granted.

276.   Further, Plaintiffs and the class members, individually and on behalf of the public, seek restitution and disgorgement of profits realized by DEFENDANTS as a result of their unfair, unlawful and/or deceptive practices.

277.   As a direct result of DEFENDANTS' unfair, unlawful and/or deceptive business acts and practices, Plaintiffs and all other class members have been damaged in an amount to be proven.  Accordingly, Plaintiffs pray for restitution and injunctive damages in an amount to be proven.

278.   Plaintiffs and class members have and will, in the future, incur expenses and costs and which Plaintiffs and class members are entitled to recover. Plaintiffs and class members are therefore entitled to injunctive relief and attorney's fees as available under California Business and Professions Code § 17200 and related sections. These acts and practices, as described in the previous paragraphs, are unfair and violate Business and Professions Code § 17200 because their policies and practices described above violate all the statutes previously listed, and consequently, constitute an unlawful business act of practice within the meaning of Business and Professions Code §17200.

279.   As a further direct and proximate result of the wrongful acts of the DEFENDANTS and each of them, Plaintiffs and the class members have been forced to incur costs associated with hiring an attorney to resolve this matter.

## FOURTEENTH CAUSE OF ACTION

## RESCISSION – CALIFORNIA CLASS

### *(By Plaintiffs, individually and on behalf of the proposed California Class Against NATIONSTAR, XOME and DOES 1-50)*

280.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

281.   Plaintiffs and class members were forced to enter into contracts with XOME through the AUCTION PROGRAM, the PROGRAM LETTER and the TERMS AND CONDITIONS (collectively, the ***"Xome Agreements"***).

282.   Plaintiffs and class members did not freely consent to the Xome Agreements. The Xome Agreements were procured and obtained through duress, menace, constructive fraud and undue influence which was exercised by NATIONSTAR against Plaintiffs and the class members.  Plaintiffs and class members would not have given consent to the Xome Agreements if such duress, menace, constructive fraud or undue influence was not present.

283.   Plaintiffs and class members hereby rescind and cancel the Xome Agreements.

## FIFTEENTH CAUSE OF ACTION

## DECLARATORY RELIEF – CALIFORNIA CLASS

### *(By Plaintiffs, individually and on behalf of the proposed California Class Against NATIONSTAR, XOME and DOES 1-50)*

284.   Plaintiffs reallege and incorporate by reference all previous paragraphs and allegations above as though fully set forth herein.

285.   A dispute has arisen, and a controversy exists between Plaintiffs and the class members, on the one hand, and DEFENDANTS, on the other hand, relating to the parties' relative rights and obligations under the AUCTION PROGRAM, the PROGRAM LETTER and the TERMS AND CONDITIONS (collectively, the XOME AGREEMENTS) in that DEFENDANTS believe that the XOME AGREEMENTS are valid and enforceable, whereas Plaintiffs and class members claim, among other things, believe as follows:

a. As alleged herein above, DEFENDANTS violated state and federal law by entering into and performing actions under the XOME AGREEMENTS;

b. DEFENDANTS breached their fiduciary duty to Plaintiffs and class members under the XOME AGREEMENTS;

c. Plaintiffs and class members did not freely consent to the XOME AGREEMENTS. Any purported consent to the XOME AGREEMENTS by Plaintiffs and class members was obtained through duress, menace, constructive fraud and undue influence which was exercised by DEFENDANTS against Plaintiffs and the class members. Plaintiffs and class members would not have given consent to the XOME AGREEMENTS if such duress, menace, constructive fraud or undue influence was not present.

d. Plaintiffs and class members were subject to extreme economic duress by NATIONSTAR'S improper threats of ignoring valid loss mitigation requests and pursuing foreclosure if Plaintiffs and class members did not consent to the XOME AGREEMENTS. Plaintiffs and class members were coerced into providing consent to the XOME AGREEMENTS. A reasonably prudent person would understand such threats as leaving them no reasonable alternative and would succumb to the perpetrator's pressure and provide such consent. Allowing one's home to be sold at foreclosure and forgoing legally required loss mitigation efforts is not a reasonable alternative to rejecting the XOME AGREEMENTS; and

e. Plaintiffs and class members believe that the public interest will be prejudiced if the XOME AGREEMENTS are permitted to stand.

286. Plaintiffs and class members have been harmed by and suffered loss as a result of the XOME AGREEMENTS.

287. Plaintiffs and class members hereby rescind the XOME AGREEMENTS.

288. Plaintiffs and class members desire a judicial determination that the XOME AGREEMENTS are void, cancelled and rescinded as a matter of law and that DEFENDANTS have been unjustly enriched and wrongfully obtained profits in an amount to be proven at trial.

289. A judicial declaration is necessary and appropriate at this time in order that the Plaintiffs and the class members may ascertain their rights and duties. This is necessary because, should Plaintiffs or class members be obliged to abide by the terms of the purported contracts, they will be irreparably harmed by such obligations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on their own behalf, and on behalf of the proposed classes, pray for judgment as follows:

1. For an order certifying the proposed classes;

2. For an order declaring the XOME AGREEMENTS represented by the AUCTION PROGRAM, the PROGRAM LETTER and the TERMS AND CONDITIONS cancelled and unenforceable;

3. For an order declaring that: (i) DEFENDANTS were obligated to disclose to Plaintiffs and the class members that XOME was affiliated with NATIONSTAR and COOPER; (ii) DEFENDANTS were obligated to disclose to Plaintiffs and the class members the charge or range of charges generally made by XOME; (iii) DEFENDANTS were obligated to disclose to Plaintiffs and the class members that they were not required to use XOME or any other particular provider of settlement services; and (iv) DEFENDANTS violated RESPA and the laws of California by failing to make such disclosures;

4. For judgment for Plaintiffs and the class member on their RESPA claims, in an amount to be proven at trial, for three times the amount of XOME

Processing Fees paid to DEFENDANTS through the AUCTION PROGRAM;

5.  For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the class members;

6.  For non-restitutionary disgorgement of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the class members;

7.  For an accounting of all credits, disbursements and charges associated with Plaintiffs' and class members' real estate transactions;

8.  For compensatory damages according to proof;

3.  For statutory damages according to proof;

4.  For punitive damages, where available, according to proof;

5.  For restitution damages on behalf of the section 17200 claimants who share a common or general interest;

6.  For injunctive relief against Defendants restraining, preventing, and enjoining Defendants from engaging in the illegal and unfair practices alleged;

7.  For interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

8.  For attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.  For such other relief as the Court deems just and proper.

///

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request that this matter be heard and decided by trial by jury.

Dated: February 23, 2021                    **SULLIVAN & YAECKEL LAW GROUP, APC**

                                            /s/ Eric K. Yaeckel
                                            Eric K. Yaeckel
                                            Attorneys for Plaintiffs ALFONSO GUZMAN
                                            and BENITA GUZMAN

**CLASS ACTION COMPLAINT**

# EXHIBIT A



CALIFORNIA
ASSOCIATION
OF REALTORS®

# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
(Seller's Brokerage Firm to Seller)
(As required by the Civil Code)
(C.A.R. Form AD, Revised 12/18)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

## SELLER'S AGENT

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:
   (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
   (b) A duty of honest and fair dealing and good faith.
   (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## BUYER'S AGENT

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:
   (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
   (b) A duty of honest and fair dealing and good faith.
   (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## AGENT REPRESENTING BOTH SELLER AND BUYER

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
   (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
   (b) Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

## SELLER AND BUYER RESPONSIBILITIES

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

| | | |
|---|---|---|
| ☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant | _Alfonso Guzman_ | Date 07 - 17 - 19 |
| ☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant | _Benita Guzman_ | Date 07/17/2019 08:32 PM PDT |
| | Benita Guzman | |
| Agent | Keller Williams The Lakes | DRE Lic. # 02053931 |
| By | Real Estate Broker (Firm) DRE Lic. # 02062586 | Date 07/17/19 |

(Salesperson or Broker-Associate, (Lany) Magdalena Guajardo

© 1991-2018, California Association of REALTORS®, Inc.

**AD REVISED 12/18 (PAGE 1 OF 2)**

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)

Keller Williams The Lakes, 31560 Railroad Canyon Rd Canyon Lake CA 92587    Phone: 9519561192    Fax:    1058 Bramble
Magdalena Guajardo    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

## CIVIL CODE SECTIONS 2079.13 – 2079.24 (2079.16 APPEARS ON THE FRONT)

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings:
(a) "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions.
(b) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. (c) "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. (d) "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. (e) "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. (f) "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation.(g) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. (h) "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. (i) "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. (j) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. (k) "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. (l) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. (m) "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. (n) "Buyer's agent" means an agent who represents a buyer in a real property transaction.

2079.14. A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgment of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: (a) The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. (b) The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

2079.15. In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17(a) As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. (b) As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.
CONFIRMATION: The following agency relationships are confirmed for this transaction:

Seller's Brokerage Firm _____DO NOT COMPLETE. SAMPLE ONLY_____ License Number _____
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent _____DO NOT COMPLETE. SAMPLE ONLY_____ License Number _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm _____DO NOT COMPLETE. SAMPLE ONLY_____ License Number _____
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent _____DO NOT COMPLETE. SAMPLE ONLY_____ License Number _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

(d) The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.
2079.18 (Repealed pursuant to AB-1289)
2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.
2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Sections 2079.14 and Section 2079.17 are complied with.
2079.21 (a) A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. (b) A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. (c) "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. (d) This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.
2079.22 Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.
2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.
2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 1991-2018, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



AD REVISED 12/18 (PAGE 2 OF 2)
## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)



CALIFORNIA
ASSOCIATION
OF REALTORS®

**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER
OR SELLER - DISCLOSURE AND CONSENT**
(C.A.R. Form PRBS, Revised 12/18)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the seller's willingness to accept a price less than the listing price or the buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller - Disclosure and Consent and agrees to the agency possibilities disclosed.**

| | | |
|---|---|---|
| Seller | Alfonso Guzman Date 07-17-19 | |
| Seller | Benita Guzman Date 08.32 PM PDT | |
| Buyer | | Date |
| Buyer | | Date |
| Buyer's Brokerage Firm | DRE Lic # | Date |
| By | DRE Lic # | Date |
| Seller's Brokerage Firm keller Williams The Lakes | DRE Lic # 02053931 | Date 07/17/19 |
| By Magdalena Guajardo | DRE Lic # 02062586 | Date 07/17/19 |

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**PRBS REVISED 12/18 (PAGE 1 OF 1)**



**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)**



CALIFORNIA
ASSOCIATION
OF REALTORS®

**WIRE FRAUD AND ELECTRONIC FUNDS
TRANSFER ADVISORY**
(C.A.R. Form WFA, Revised 12/17)

Property Address: _1058 Bramble Way, San Jacinto, CA  92582-3014_____ ("Property").

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFERS ADVISORY:

The ability to communicate and conduct business electronically is a convenience and reality in nearly all parts of our lives. At the same time, it has provided hackers and scammers new opportunities for their criminal activity. Many businesses have been victimized and the real estate business is no exception.

While wiring or electronically transferring funds is a welcome convenience, we all need to exercise extreme caution. Emails attempting to induce fraudulent wire transfers have been received and have appeared to be legitimate. Reports indicate that some hackers have been able to intercept emailed transfer instructions, obtain account information and, by altering some of the data, redirect the funds to a different account. It also appears that some hackers were able to provide false phone numbers for verifying the wiring or funds transfer instructions. In those cases, the victim called the number provided to confirm the instructions, and then unwittingly authorized a transfer to somewhere or someone other than the intended recipient.

## ACCORDINGLY, YOU ARE ADVISED:

1. **Obtain phone numbers and account numbers only from Escrow Officers, Property Managers, or Landlords at the beginning of the transaction.**
2. **DO NOT EVER WIRE OR ELECTRONICALLY TRANSFER FUNDS PRIOR TO CALLING TO CONFIRM THE TRANSFER INSTRUCTIONS. ONLY USE A PHONE NUMBER YOU WERE PROVIDED PREVIOUSLY. Do not use any different phone number or account number included in any emailed transfer instructions.**
3. **Orally confirm the transfer instruction is legitimate and confirm the bank routing number, account numbers and other codes before taking steps to transfer the funds.**
4. **Avoid sending personal information in emails or texts. Provide such information in person or over the telephone directly to the Escrow Officer, Property Manager, or Landlord.**
5. **Take steps to secure the system you are using with your email account. These steps include creating strong passwords, using secure WiFi, and not using free services.**

If you believe you have received questionable or suspicious wire or funds transfer instructions, immediately notify your bank, and the other party, and the Escrow Office, Landlord, or Property Manager. The sources below, as well as others, can also provide information:

Federal Bureau of Investigation: https://www.fbi.gov/; the FBI's IC3 at www.ic3.gov; or 310-477-6565

National White Collar Crime Center: http://www.nw3c.org/

On Guard Online: https://www.onguardonline.gov/

**NOTE: There are existing alternatives to electronic and wired fund transfers such as cashier's checks. By signing below, the undersigned acknowledge that each has read, understands and has received a copy of this Wire Fraud and Electronic Funds Transfer Advisory.**

| | | |
|---|---|---|
| Buyer/Tenant _____ | Date _____ | |
| Buyer/Tenant _____ | Date _____ | |
| Seller/Landlord _~Alfonso Guzman~_ | Alfonso Guzman Date 07-17-19 | 07/17/2019 |
| Seller/Landlord _~Benita Guzman~_ | Benita Guzman Date 08:32 PM PDT | |

©2016-2017, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**WFA REVISED 12/17 (PAGE 1 OF 1)**

WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY (WFA PAGE 1 OF 1)

| | | | |
|---|---|---|---|
| Keller Williams The Lakes, 31580 Railroad Canyon Rd Canyon Lake CA 92587 | Phone: 9519561192 | Fax: | 1058 Bramble |
| Magdalena Guajardo | Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com | | |



CALIFORNIA
ASSOCIATION
OF REALTORS®

**RESIDENTIAL LISTING AGREEMENT**
(Exclusive Authorization and Right to Sell)
(C.A.R. Form RLA, Revised 12/18)

Date Prepared: 07/17/2019

1. **EXCLUSIVE RIGHT TO SELL:** _Alfonso Guzman , Benita Guzman_ ("Seller")
   hereby employs and grants _keller Williams The Lakes_ ("Broker")
   beginning (date) _07-17-19_ and ending at 11:59 P.M. on (date) _03-31-2020_ ("Listing Period")
   the exclusive and irrevocable right to sell or exchange the real property described as _1058 Bramble Way_
   _____, situated in _San Jacinto_ (City),
   _Riverside_ (County), California, _92582-3014_ (Zip Code), Assessor's Parcel No. _436462006_ ("Property").
   ☐ This Property is a manufactured (mobile) home. See addendum for additional terms.
   ☐ This Property is being sold as part of a probate, conservatorship or guardianship. See addendum for additional terms.

2. **LISTING PRICE AND TERMS:**
   A. The listing price shall be: _____
      Dollars ($ _945,000.00_).
   B. Listing Terms: _____

3. **COMPENSATION TO BROKER:**
   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Seller and Broker (real estate commissions include all compensation and fees to Broker).**
   A. Seller agrees to pay to Broker as compensation for services irrespective of agency relationship(s), either ☐ _6.000_ percent of the listing price (or if a purchase agreement is entered into, of the purchase price), or ☐ $ _____,
      AND _____, as follows:
      (1) If during the Listing Period, or any extension, Broker, cooperating broker, Seller or any other person procures a ready, willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the Buyer completes the transaction or is prevented from doing so by Seller. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)
      OR (2) If within _30_ calendar days (a) after the end of the Listing Period or any extension; or (b) after any cancellation of this Agreement, unless otherwise agreed, Seller enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ("Prospective Buyer") or that person's related entity: (i) who physically entered and was shown the Property during the Listing Period or any extension by Broker or a cooperating broker; or (ii) for whom Broker or any cooperating broker submitted to Seller a signed, written offer to acquire, lease, exchange or obtain an option on the Property. Seller, however, shall have no obligation to Broker under paragraph 3A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given Seller a written notice of the names of such Prospective Buyers.
      OR (3) If, without Broker's prior written consent, the Property is withdrawn from sale, conveyed, leased, rented, otherwise transferred, or made unmarketable by a voluntary act of Seller during the Listing Period, or any extension.
   B. If completion of the sale is prevented by a party to the transaction other than Seller, then compensation which otherwise would have been earned under paragraph 3A shall be payable only if and when Broker collects damages by suit, arbitration, settlement or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.
   C. In addition, Seller agrees to pay Broker: _____
   D. Seller has been advised of Broker's policy regarding cooperation with, and the amount of compensation offered to, other brokers.
      (1) Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ("MLS") by offering to MLS brokers out of Broker's compensation specified in 3A, either ☐ _2.500_ percent of the purchase price, or ☐ $ _____.
      (2) Broker is authorized to cooperate with and compensate brokers operating outside the MLS as per Broker's policy.
   E. Seller hereby irrevocably assigns to Broker the above compensation from Seller's funds and proceeds in escrow. Broker may submit this Agreement, as instructions to compensate Broker pursuant to paragraph 3A, to any escrow regarding the Property involving Seller and a buyer, Prospective Buyer or other transferee.
   F. (1) Seller represents that Seller has not previously entered into a listing agreement with another broker regarding the Property, unless specified as follows: _____
      (2) Seller warrants that Seller has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the following individuals or entities: _____
      (3) If the Property is sold to anyone listed above during the time Seller is obligated to compensate another broker: (i) Broker is not entitled to compensation under this Agreement; and (ii) Broker is not obligated to represent Seller in such transaction.

© 2019, California Association of REALTORS®, Inc.
**RLA REVISED 12/18 (PAGE 1 OF 5)**

Seller's Initials (_A.G._) (_BG_) 

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 1 OF 5)**

Property Address: _1058 Bramble Way, San Jacinto, CA  92582-3014_      Date: _07/17/2019_

**4. A. ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in a real estate purchase agreement, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded, from the purchase price.

    **ADDITIONAL ITEMS EXCLUDED:** _____ .

    **ADDITIONAL ITEMS INCLUDED:** _____ .

Seller intends that the above items be excluded or included in offering the Property for sale, but understands that: (i) the purchase agreement supersedes any intention expressed above and will ultimately determine which items are excluded and included in the sale; and (ii) Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the purchase agreement.

**B. (1) Leased Or Not Owned Items:** The following items are leased or not owned by Seller:

    ☐ Solar power system    ☐ Alarm system    ☐ Propane tank    ☐ Water Softener

    ☐ Other _____

**(2) Liened Items:** The following items have been financed and a lien has been placed on the Property to secure payment:

    ☐ Solar power system    ☐ Windows or doors    ☐ Heating/Ventilation/Air conditioning system

    ☐ Other _____

Seller will provide to Buyer, as part of the sales agreement, copies of lease documents, or other documents obligating Seller to pay for any such leased or liened item.

**5. MULTIPLE LISTING SERVICE:**

**A.** Broker is a participant/subscriber to _____ _CRMLS_ _____ Multiple Listing Service (MLS) and possibly others. Unless otherwise instructed in writing the Property will be listed with the MLS(s) specified above. If that MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. All terms of the transaction, including sales price and financing, if applicable, (i) will be provided to the MLS in which the property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS and (ii) may be provided to the MLS even if the Property was not listed with the MLS. Seller consents to Broker providing a copy of this listing agreement to the MLS if required by the MLS.

---

### BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS; PRESENTING ALL OFFERS

**WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit listing information to Internet sites that post property listings online.

**EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS.

**CLOSED/PRIVATE LISTING CLUBS OR GROUPS:** Closed or private listing clubs or groups are not the same as the MLS. The MLS referred to above is accessible to all eligible real estate licensees and provides broad exposure for a listed property. Private or closed listing clubs or groups of licensees may have been formed outside the MLS. Private or closed listing clubs or groups are accessible to a more limited number of licensees and generally offer less exposure for listed property. Whether listing property through a closed, private network - and excluding it from the MLS - is advantageous or disadvantageous to a seller, and why, should be discussed with the agent taking the Seller's listing.

**NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

**OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: (a) real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; (b) Information about Seller's Property will not be transmitted from the MLS to various real estate Internet sites that are used by the public to search for property listings; (c) real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.

**REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

**PRESENTING ALL OFFERS:** Seller understands that Broker must present all offers received for Seller's Property unless Seller gives Broker written instructions to the contrary.

---

Seller's Initials ( _A. G._ )( _BG_ )      Broker's/Agent's Initials ( _M G_ )( _____ )

Seller's Initials ( _A. G._ ) ( _BG_ )

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 2 OF 5)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com     1058 Bramble

Property Address: *1058 Bramble Way, San Jacinto, CA 92582-3014*       Date: *07/17/2019*

**B.** MLS rules generally provide that residential real property and vacant lot listings be submitted to the MLS within 2 days or some other period of time after all necessary signatures have been obtained on the listing agreement. Broker will not have to submit this listing to the MLS if, within that time, Broker submits to the MLS an appropriate form signed by Seller.
☐ Seller elects to exclude the Property from the MLS as provided by C.A.R. Form SELM or the local equivalent form.

**C.** MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Seller acknowledges that for any of the below opt-out instructions to be effective, Seller must make them on a separate instruction to Broker signed by Seller. Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:

**(1) Property Availability On The MLS; Address On the MLS:** Seller can instruct Broker to have the MLS not display the Property or the Property address on the Internet. Seller understands that either of these opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.

**(2) Feature Opt-Outs:** Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below. Seller understands (i) that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; (ii) that other Internet sites may or may not have the features set forth herein; and (iii) that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.

**(a) Comments And Reviews:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display.

**(b) Automated Estimate Of Value:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display. ☐ Seller elects to opt out of certain Internet features as provided by C.A.R. Form SELI or the local equivalent form.

**6. SELLER REPRESENTATIONS:** Seller represents that, unless otherwise specified in writing, Seller is unaware of: (i) any Notice of Default recorded against the Property; (ii) any delinquent amounts due under any loan secured by, or other obligation affecting the Property; (iii) any bankruptcy, insolvency or similar proceeding affecting the Property; (iv) any litigation, arbitration, administrative action, government investigation or other pending or threatened action that affects or may affect the Property or Seller's ability to transfer it; and (v) any current, pending or proposed special assessments affecting the Property. Seller shall promptly notify Broker in writing if Seller becomes aware of any of these items during the Listing Period or any extension thereof.

**7. BROKER'S AND SELLER'S DUTIES:**

**A.** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Seller gives Broker written instructions to the contrary, Broker is authorized, but not required, to (i) order reports and disclosures including those specified in 7C as necessary, (ii) advertise and market the Property by any method and in any medium selected by Broker, including MLS and the Internet, and, to the extent permitted by these media, control the dissemination of the information submitted to any medium; and (iii) disclose to any real estate licensee making an inquiry the receipt of any offers on the Property and the offering price of such offers.

**B.** Seller agrees to consider offers presented by Broker, and to act in good faith to accomplish the sale of the Property by, among other things, making the Property available for showing at reasonable times and, subject to paragraph 3F, referring to Broker all inquiries of any party interested in the Property. Seller is responsible for determining at what price to list and sell the Property.

**C.** Investigations and Reports: Seller agrees, within 5 (or___) Days of the beginning date of this Agreement, to pay for the following pre-sale reports: ☐ Structural Pest Control ☐ General Property Inspection ☐ Homeowners Association Documents ☐ Other _____

**D.** Seller further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments attorney fees and costs arising from any incorrect or incomplete information supplied by Seller, or from any material facts that Seller knows but fails to disclose including dangerous or hidden conditions on the Property.

**8. DEPOSIT:** Broker is authorized to accept and hold on Seller's behalf any deposits to be applied toward the purchase price.

**9. AGENCY RELATIONSHIPS:**

**A. Disclosure:** The Seller acknowledges receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).

**B. Seller Representation:** Broker shall represent Seller in any resulting transaction, except as specified in paragraph 3F.

**C. Possible Dual Agency With Buyer:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Seller and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Seller any election to act as a dual agent representing both Seller and Buyer. If a Buyer is procured directly by Broker or an associate-licensee in Broker's firm, Seller hereby consents to Broker acting as a dual agent for Seller and Buyer. In the event of an exchange, Seller hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Seller understands and agrees that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

Seller's Initials (  ) (  )

**RLA REVISED 12/18 (PAGE 3 OF 5)**

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 3 OF 5)**

Property Address: *1058 Bramble Way, San Jacinto, CA  92582-3014*                                      Date: *07/17/2019*

   **D. Confirmation:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Seller's execution of a purchase agreement.

   **E. Potentially Competing Sellers and Buyers:** Seller understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or purchase through Broker, property the same as or similar to Seller's Property. Seller consents to Broker's representation of sellers and buyers of other properties before, during and after the end of this Agreement. Seller acknowledges receipt of a [X] "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

**10. SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of, the interior of the Property. Seller agrees: (i) to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and (ii) to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Seller. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Seller (such as "nanny cams" and hidden security cameras). Seller is advised to post notice disclosing the existence of security devices.

**11. PHOTOGRAPHS AND INTERNET ADVERTISING:**

   **A.** In order to effectively market the Property for sale it is often necessary to provide photographs, virtual tours and other media to buyers. Seller agrees (or [ ] if checked, does not agree) that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Property ("Images") for static and/or virtual tours of the Property by buyers and others  for use on Broker's website, the MLS, and other marketing materials and sites. Seller acknowledges that once Images are placed on the Internet neither Broker nor Seller has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Seller further assigns any rights in all Images to the Broker and agrees that such Images are the property of Broker and that Broker may use such Images for advertising, including post sale and for Broker's business in the future.

   **B.** Seller acknowledges that prospective buyers and/or other persons coming onto the property may take photographs, videos or other images of the property. Seller understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. (If checked ) [ ] Seller instructs Broker to publish in the MLS that taking of Images is limited to those persons preparing Appraisal or Inspection reports. Seller acknowledges that unauthorized persons may take images who do not have access to or have not read any limiting instruction in the MLS or who take images regardless of any limiting instruction in the MLS. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Seller has control over who views such Images nor what use viewers may make of the Images.

**12. KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors, and accompanied prospective buyers. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism or damage attributed to the use of a keysafe/lockbox. Seller does (or if checked [ ] does not) authorize Broker to install a keysafe/lockbox. If Seller does not occupy the Property, Seller shall be responsible for obtaining occupant(s)' written permission for use of a keysafe/lockbox (C.A.R. Form KLA).

**13. SIGN:** Seller does (or if checked [ ] does not) authorize Broker to install a FOR SALE/SOLD sign on the Property.

**14. EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

**15. ATTORNEY FEES:** In any action, proceeding or arbitration between Seller and Broker to enforce the compensation  provisions of this Agreement, the prevailing Seller or Broker shall be entitled to reasonable attorney fees and costs from the non-prevailing Seller or Broker, except as provided in paragraph 19A.

**16. ADDITIONAL TERMS:** [ ] REO Advisory Listing (C.A.R. Form REOL) [X] Short Sale Information and Advisory (C.A.R. Form SSIA)
   [ ] Trust Advisory (C.A.R. Form TA)
   [ ] Seller intends to include a contingency to purchase a replacement property as part of any resulting transaction
   _____
   _____
   _____
   _____

**17. MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Agreement, in writing, within **5 Days** After its execution.

**18. SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon Seller and Seller's successors and assigns.

**19. DISPUTE RESOLUTION:**

   **A. MEDIATION:** Seller and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. **Exclusions from this mediation agreement are specified in paragraph 19B.**

**RLA REVISED 12/18 (PAGE 4 OF 5)**

Seller's Initials ( A. C. ) ( BG )

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 4 OF 5)**

Property Address: *1058 Bramble Way, San Jacinto, CA 92582-3014*                                             Date: *07/17/2019*

**B. ADDITIONAL MEDIATION TERMS:** The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.

**C. ADVISORY:** If Seller and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).

**20. ENTIRE AGREEMENT:** All prior discussions, negotiations and agreements between the parties concerning the subject matter of this Agreement are superseded by this Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Agreement and any supplement, addendum or modification, including any photocopy or facsimile, may be executed in counterparts.

**21. OWNERSHIP, TITLE AND AUTHORITY:** Seller warrants that: (i) Seller is the owner of the Property; (ii) no other persons or entities have title to the Property; and (iii) Seller has the authority to both execute this Agreement and sell the Property. Exceptions to ownership, title and authority are as follows:_____

☐ **REPRESENTATIVE CAPACITY:** This Listing Agreement is being signed for Seller by an individual acting in a Representative Capacity as specified in the attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. Seller (i) represents that the entity for which the individual is signing already exists and (ii) shall Deliver to Broker, within 3 Days After Execution of this Agreement, evidence of authority to act (such as but not limited to: applicable trust document, or portion thereof, letters testamentary, court order, power of attorney, resolution, or formation documents of the business entity).

**By signing below, Seller acknowledges that Seller has read, understands, received a copy of and agrees to the terms of this Agreement.**

Seller _____   Alfonso Guzman Date _____
Alfonso Guzman
Address _____ City _____ State ____ Zip ____
Telephone _____ Fax _____ E-mail _____

Seller _Benita Guzman_   Benita Guzman Date  07/17/2019 08:32 PM PDT
Benita Guzman
Address _____ City _____ State ____ Zip ____
Telephone _____ Fax _____ E-mail _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

Real Estate Broker (Firm) _keller Williams The Lakes_   DRE Lic. # _02053931_
Address _____ City _____ State ____ Zip ____
By _____ Tel._(951)956-1192_ E-mail _m.guajardo@kw.com_ DRE Lic.# _02062586_ Date _____
Magdalena Guajardo
By _____ Tel. _____ E-mail _____ DRE Lic.# _____ Date _____

☐ Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

RLA REVISED 12/18 (PAGE 5 OF 5)

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 5 OF 5)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          1058 Bramble



CALIFORNIA
ASSOCIATION
OF REALTORS®

**SELLER'S ADVISORY**
(C.A.R. Form SA, Revised 12/15)

Property Address: _1058 Bramble Way, San Jacinto, CA  92582-3014_ _____ ("Property")

1. **INTRODUCTION:** Selling property in California is a process that involves many steps. From start to finish, it could take anywhere from a few weeks to many months, depending upon the condition of your Property, local market conditions and other factors. You have already taken an important first step by listing your Property for sale with a licensed real estate broker. Your broker will help guide you through the process and may refer you to other professionals, as needed. This advisory addresses many things you may need to think about and do as you market your Property. Some of these things are requirements imposed upon you, either by law or by the listing or sale contract. Others are simply practical matters that may arise during the process. Please read this document carefully and, if you have any questions, ask your broker or appropriate legal or tax advisor for help.

2. **DISCLOSURES:**
   A. **General Disclosure Duties:** You must affirmatively disclose to the buyer, in writing, any and all known facts that materially affect the value or desirability of your Property. You must disclose these facts whether or not asked about such matters by the buyer, any broker, or anyone else. This duty to disclose applies even if the buyer agrees to purchase your Property in its present condition without requiring you to make any repairs. If you do not know what or how to disclose, you should consult a real estate attorney in California of your choosing. Broker cannot advise you on the legal sufficiency of any disclosures you make. If the Property you are selling is a residence with one to four units except for certain subdivisions, your broker also has a duty to conduct a reasonably competent and diligent visual inspection of the accessible areas and to disclose to a buyer all adverse material facts that the inspection reveals. If your broker discovers something that could indicate a problem, your broker must advise the buyer.
   B. **Statutory Duties:** (For one-to-four Residential Units):
      (1) You must timely prepare and deliver to the buyer, among other things, a Real Estate Transfer Disclosure Statement ("TDS"), and a Natural Hazard Disclosure Statement ("NHD"). You have a legal obligation to honestly and completely fill out the TDS form in its entirety. (Many local entities or organizations have their own supplement to the TDS that you may also be asked to complete.) The NHD is a statement indicating whether your Property is in certain designated flood, fire or earthquake/seismic hazard zones. Third-party professional companies can help you with this task.
      (2) Depending upon the age and type of construction of your Property, you may also be required to provide and, in certain cases you can receive limited legal protection by providing, the buyer with booklets entitled "The Homeowner's Guide to Earthquake Safety," "The Commercial Property Owner's Guide to Earthquake Safety," "Protect Your Family From Lead in Your Home" and "Environmental Hazards: A Guide For Homeowners and Buyers." Some of these booklets may be packaged together for your convenience. The earthquake guides ask you to answer specific questions about your Property's structure and preparedness for an earthquake. If you are required to supply the booklet about lead, you will also be required to disclose to the buyer any known lead-based paint and lead-based paint hazards on a separate form. The environmental hazards guide informs the buyer of common environmental hazards that may be found in properties.
      (3) If you know that your property is: (i) located within one mile of a former military ordnance location; or (ii) in or affected by a zone or district allowing manufacturing, commercial or airport use, you must disclose this to the buyer. You are also required to make a good faith effort to obtain and deliver to the buyer a disclosure notice from the appropriate local agency(ies) about any special tax levied on your Property pursuant to the Mello-Roos Community Facilities Act, the Improvement Bond Act of 1915, and a notice concerning the contractual assessment provided by section 5898.24 of the Streets And Highways Code (collectively, "Special Tax Disclosures").
      (4) If the TDS, NHD, or lead, military ordnance, commercial zone or Special Tax Disclosures are provided to a buyer after you accept that buyer's offer, the buyer will have 3 days after delivery (or 5 days if mailed) to terminate the offer, which is why it is extremely important to complete these disclosures as soon as possible. There are certain exemptions from these statutory requirements; however, if you have actual knowledge of any of these items, you may still be required to make a disclosure as the items can be considered material facts.
   C. **Death and Other Disclosures:** Many buyers consider death on real property to be a material fact in the purchase of property. In some situations, it is advisable to disclose that a death occurred or the manner of death; however, California Civil Code Section 1710.2 provides that <u>you have no disclosure duty</u> "where the death has occurred more than three years prior to the date the transferee offers to purchase, lease, or rent the real property, or [regardless of the date of occurrence] that an occupant of that property was afflicted with, or died from, Human T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus." This law does not "immunize an owner or his or her agent from making an intentional misrepresentation in response to a direct inquiry from a transferee or a prospective transferee of real property, concerning deaths on the real property."
   D. **Condominiums and Other Common Interest Subdivisions:** If the Property is a condominium, townhouse, or other property in a common interest subdivision, you must provide to the buyer copies of the governing documents, the most recent financial statements distributed, and other documents required by law or contract. If you do not have a current version of these documents, you can request them from the management of your homeowner's association. To avoid delays, you are encouraged to obtain these documents as soon as possible, even if you have not yet entered into a purchase agreement to sell your Property.

3. **CONTRACT TERMS AND LEGAL REQUIREMENTS:**
   A. **Contract Terms and Conditions:** A buyer may request, as part of the contract for the sale of your Property, that you pay for repairs to the Property and other items. Your decision on whether or not to comply with a buyer's requests may affect your ability to sell your Property at a specified price.

© 1991-2015, California Association of REALTORS®, Inc.

Seller's Initials (_A. G._) (_BG_)

SA REVISED 12/15 (PAGE 1 OF 2)

**SELLER'S ADVISORY (SA PAGE 1 OF 2)**

Property Address: _1058 Bramble Way, San Jacinto, CA  92582-3014_        Date: _07/17/2019_

**B. Withholding Taxes:** Under federal and California tax laws, a buyer is required to withhold a portion of the purchase price from your sale proceeds for tax purposes unless you sign an affidavit of non-foreign status and California residency, or some other exemption applies and is documented.

**C. Prohibition Against Discrimination:** Discriminatory conduct in the sale of real property against individuals belonging to legally protected classes is a violation of the law.

**D. Government Required Repairs, Replacements and Alterations:** Under State law, Property owners with limited exceptions, are required to: (1) install operable smoke alarms and brace water heaters and provide a Buyer with a statement of compliance. Existing operable smoke alarms, that met compliance standards when installed, do no have to be removed even if not up to current legal requirements. Smoke alarms that are added or that replace older versions must comply with current law; and (2) install carbon monoxide detection devices. Some city and county governments may impose additional requirements, including, but not limited to, installing low-flow toilets and showerheads, gas shut-off valves, tempered glass, and barriers around swimming pools and spas. You should consult with the appropriate governmental agencies, inspectors, and other professionals to determine which requirements apply to your Property, the extent to which your Property complies with such requirements, and the costs, if any, of compliance.

**E. EPA's LEAD-BASED PAINT RENOVATION, REPAIR AND PAINTING RULE:** The new rule requires that contractors and maintenance professionals working in pre-1978 housing, child care facilities, and schools with lead-based paint be certified; that their employees be trained; and that they follow protective work practice standards. The rule applies to renovation, repair, or painting activities affecting more than six square feet of lead-based paint in a room or more than 20 square feet of lead-based paint on the exterior. Enforcement of the rule begins October 1, 2010. See the EPA website at www.epa.gov/lead for more information.

**F. Legal, Tax and Other Implications:** Selling your Property may have legal, tax, insurance, title or other implications. You should consult an appropriate professional for advice on these matters.

**4. MARKETING CONSIDERATIONS:**

**A. Pre-Sale Inspections and Considerations:** You should consider doing what you can to prepare your Property for sale, such as correcting any defects or other problems, making cosmetic improvements, and staging. Many people are not aware of defects in or problems with their own Property. One way to make yourself aware is to obtain professional inspections prior to sale. Pre-sale inspections may include a general property inspection; an inspection for wood destroying pest and organisms (Structural Pest Control Report) and an inspection of the septic or well systems, if any, among others. By doing this, you then have an opportunity to make repairs before your Property is sold, which may enhance its marketability. Keep in mind, however, that any problems revealed by such inspection reports or repairs that have been made, whether or not disclosed in a report, should be disclosed to the buyer (see "Disclosures" in paragraph 2 above). This is true even if the buyer gets his/her own inspections covering the same area. Obtaining inspection reports may also assist you during contract negotiations with the buyer. For example, if a Structural Pest Control Report has both a primary and secondary recommendation for clearance, you may want to specify in the purchase agreement those recommendations, if any, for which you are going to pay.

**B. Post-Sale Protections:** It is often helpful to provide the buyer with, among other things, a home protection/warranty plan for the Property. These plans will generally cover problems, not deemed to be pre-existing, that occur after your sale is completed. In the event something does go wrong after the sale, and it is covered by the plan, the buyer may be able to resolve the concern by contacting the home protection company.

**C. Safety Precautions:** Advertising and marketing your Property for sale, including, but not limited to, holding open houses, placing a keysafe/lockbox, erecting FOR SALE signs, and disseminating photographs, video tapes, and virtual tours of the premises, may jeopardize your personal safety and that of your Property. You are strongly encouraged to maintain insurance, and to take any and all possible precautions and safeguards to protect yourself, other occupants, visitors, your Property, and your belongings, including cash, jewelry, drugs, firearms and other valuables located on the Property, against injury, theft, loss, vandalism, damage, and other harm.

**D. Expenses:** You are advised that you, not the Broker, are responsible for the fees and costs, if any, to comply with your duties and obligations to the buyer of your Property.

**5. OTHER ITEMS:** _____

---

Seller has read and understands this Advisory. By signing below, Seller acknowledges receipt of a copy of this document.

Seller _____     Date _07-17-19_

Print Name _Alfonso Guzman_

Seller _Benita Guzman_     Date _07/17/2019 08:32 PM PDT_

Print Name _Benita Guzman_

Real Estate Broker (Listing Firm) ~~Keller Williams The Lakes~~     DRE Lic.#: _02053931_

By _____ _Magdalena Guajardo_ DRE Lic.# _02062586_     Date _07/07/19_

By _____ DRE Lic.# _____     Date _____

Address _____ City _____ State ____ Zip ____

Telephone _(951)956-1192_    Fax _____    E-mail _m.guajardo@kw.com_

© 1991-2015, California Association of REALTORS®, Inc. Copyright claimed in Form SA, exclusive of language required by California Civil Code §1710.2. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**SA REVISED 12/15 (PAGE 2 OF 2)**

# EXHIBIT B



CHANGING THE FACE OF HOME LOANS

8950 Cypress Waters Blvd.
Dallas, TX 75019

**OUR INFO**
**ONLINE**
www.mrcooper.com

ALFONSO GUZMAN
BENITA M GUZMAN
1058 BRAMBLE WAY
SAN JACINTO, CA 92582

August 16, 2019

**YOUR INFO**
**LOAN NUMBER:** 600298913
**PROPERTY ADDRESS:**
1058 BRAMBLE WAY
SAN JACINTO, CA 92582

Dear ALFONSO GUZMAN AND BENITA M GUZMAN :

As a follow up to our conversation regarding Mr. Cooper's Short Sale Validation Program (the "Validation Program"), we are providing you with a copy of Mr. Cooper's Short Sale Validation Program Terms and Conditions (the "Terms and Conditions").

The Validation Program is designed to assist borrowers like you who have already received a short sale offer. In order to verify the market value of the property, Mr. Cooper will use the services of Xome Inc.[1] (hereinafter referred to as "Xome") to conduct an expanded marketing campaign followed by an online offer validation of the property in which additional offers may be submitted. This process is likely to generate additional interest in your property, and could result in an even higher offer for your property. Xome's role will be limited to acting as the auctioneer only (including conducting marketing in connection with the program); any communication regarding your loan should be made directly with Mr. Cooper.

**In order for us to process your short sale request, you and your agent will both need to read the Terms and Conditions carefully, sign the form where indicated and return the fully executed document to your real estate agent.** *If you fail to submit the fully-executed Terms and Conditions within 10 days as of the date of this letter, your short sale request cannot be processed.*

As a reminder, the following are potential benefits of completing a short sale through the Validation Program:

- You may avoid foreclosure sale of your property.
- Any foreclosure sale date will be suspended while the property is in the Validation Program.

---

[1] Xom e Realty Services CT LLC (for CT properties).

Mr. Cooper is simply a new brand name for Nationstar Mortgage LLC. Nationstar Mortgage LLC is doing business as Nationstar Mortgage LLC d/b/a Mr. Cooper. Mr. Cooper is a service mark of Nationstar Mortgage LLC. All rights reserved.

**Please be advised this communication is sent for informational purposes only and is not intended as an attempt to collect, assess, or recover a claim against, or demand payment from, any individual protected by the U.S. Bankruptcy Code. If this account has been discharged in a bankruptcy proceeding, be advised this communication is for informational purposes only and not an attempt to collect a debt against you; however, the servicer/lender reserves the right to exercise the legal rights only against the property securing the loan obligation, including the right to foreclose its lien under appropriate circumstances. Nothing in this correspondence shall be construed as an attempt to collect against the borrower personally or an attempt to revive personal liability.**



EQUAL HOUSING
OPPORTUNITY



- The proceeds of the short sale will be used to pay off the balance of your loan(s).  To the extent recovery of deficiency balances is permitted by applicable law, the remaining deficiency balance of your loan will be waived (subject to approval by the mortgage insurance provider, if applicable).
- You may be eligible to relocation assistance to assist with the costs associated with moving if the final approved offer is received through the Validation Program.

Sincerely,

Mr. Cooper



**Mr. Cooper's Short Sale Validation Program Terms and Conditions**

1. The short sale must be an "arm's length" transaction. An arm's length transaction means that you cannot list the property with or sell it to anyone to whom you are related or with whom you have a close personal or business relationship.

2. If you are in default on your loan, the foreclosure process may begin or continue while the property is in the Validation Program; however, the foreclosure date will be suspended until the property is sold in an approved sale or otherwise removed from the Validation Program.

3. You will be required to vacate the property upon successful closing of a short sale. You are responsible for all maintenance and expenses on the property through the date that it is sold.

4. Mr. Cooper may include the property in an expanded marketing campaign followed by an online auction of the property in which additional offers may be submitted. This process is likely to generate additional interest in your property, and could result in an even higher offer for your property. Mr. Cooper will use the services of Xome for such marketing and auction. Xome's role in the short sale process will be limited to acting as the auctioneer ONLY (including conducting marketing in connection with the auction); any communication regarding your loan should be made directly with Mr. Cooper.

5. If the offer you submitted grants the buyer a right of first refusal or similar right, such offer will not be considered for a short sale unless such offer is revised to omit such right and resubmitted to Mr. Cooper.

6. If Mr. Cooper uses the services of Xome, your property may be advertised and marketed prior to the event (which may include Xome's auction website, print advertising, web media, direct mail, and email marketing), and you and your listing agent agree to cooperate by, among other things, (a) providing access to the property for a third party valuation to be completed prior to the event, (b) making your property available for at least one (1) open house date prior to the event date and directing any interested parties to submit offers through the process, (c) responding to inquiries and assisting any parties interested in the property, and (d) providing to Xome, potential buyers and the winning bidder all legally required disclosures related to the property. Your listing agent will be listed as the contact for bidders who are interested in purchasing the property. All costs of such additional advertising and marketing shall be at no cost to you.

7. The original buyer who previously submitted an offer is encouraged to register and bid at the event. Should the original buyer be the winning bidder at the event, the buyer's premium will be waived for the transaction. The buyer must register and participate in the auction to be eligible to have the buyer's premium waived. Mr. Cooper will not consider any offer (including a counter offer from the original buyer) submitted outside of the program while the property is in the Validation Program; all offers not previously submitted to Mr. Cooper must be submitted using the process.

8. If a higher offer is obtained through the Offer Validation Program, Mr. Cooper may present such offer to you, through your listing agent, for consideration. Mr. Cooper will evaluate your current offer and any other offers obtained through the Offer Validation Program and make a firm decision on their acceptability.

9. In connection with the auction and marketing services provided by Xome, a buyer's premium in an amount not to exceed five percent (5%) of the winning bid amount shall be added to the winning bid amount to establish a "Total Purchase Price" for any buyer obtained through the Xome auction website. The buyer's premium will apply to all bidders, except that (a) the buyer's premium will not



**Mr. Cooper's Short Sale Validation Program Terms and Conditions**

apply if the originally submitted offer is the offer resulting in the highest net proceeds to the investor, or (b) if the highest bidder is the original buyer at the auction. The buyer's premium shall be paid by the buyer to Xome at closing from the sale proceeds due to the lender/servicer on behalf of the investor. Note that Xome is a Mr. Cooper affiliate, and Mr. Cooper receives revenue from its affiliate for performing pre- and post-auction services in connection with the Validation Program. Xome may submit these Terms and Conditions to any escrow as escrow instructions for the payment of the buyer's premium.

10. Neither you nor any other person shall enter any bid for the property on your behalf at any auction. Notwithstanding the foregoing, Xome has the right to enter a bid for the property up to a predetermined "reserve price" during any event to encourage bidding (but not as an offer to purchase the property). Xome will not enter bids above the reserve price. Note: This is a common auction practice and increases the likelihood that the auction will result in an approved sale. When placing a below-reserve price bid on behalf of the seller of a property, the intent of Xome is to create an active marketplace for the property. This practice benefits the borrower by maximizing the price obtained (and lowering any potential deficiency balance where it is applicable under applicable law), and benefits potential buyers by keeping the auction alive for a longer period of time in the hopes of meeting the reserve price and effectuating a short sale. [2]

11. Once the event has ended, the buyer will be asked to sign the purchase contract with the winning bidder. The signed contract and all supporting documentation will be sent to your listing agent to obtain your signatures. In order to complete the short sale, you will need to submit the fully executed contract to Mr. Cooper within 48 hours for final written approval, which may be withheld for any or no reason. Time is of the essence in obtaining all required signatures.

12. The listing agreement between you and your listing agent sets forth the terms under which your listing agent shall market and sell your property. If your property is sold through the Xome auction website, any commission(s) that are to be calculated as a percentage of the sale price shall be calculated based solely upon the winning bid amount (i.e. the sale price less the buyer's premium, if applicable), not the total purchase price.

13. Xome is compensated through the buyer's premium and not from your listing agent's commission. Should your listing agent be representing both you and the buyer on the originally submitted offer, your listing agent agrees that if a higher offer is obtained from a buyer who has a different buyer's agent, your listing agent will be responsible for any applicable cooperating broker commission. However, if a higher offer is obtained from a buyer that does not have a buyer's agent; such buyer will be referred to your listing agent.

14. Xome maintains a real estate broker license in all jurisdictions where it is required (see xome.com/pages/licensing for a listing of such licenses); however, you and your real estate agent acknowledge that Xome is and will be acting as the auctioneer ONLY (including conducting marketing in connection with the event) and does not represent any buyer or seller as their real estate broker or agent in this transaction. Your listing agent shall remain the listing agent for the property and shall continue to be responsible for ensuring compliance with his or her duties as listing agent in the transaction, and you shall look to your listing agent with respect to all real estate agent-related services in connection with this transaction.

---

[2] In the event that Xome enters a bid on a California property, any such bid will be contemporaneously disclosed to all auction participants.



**Mr. Cooper's Short Sale Validation Program Terms and Conditions**

To the extent that Xome is deemed to be acting as a real estate agent in connection with this transaction, Xome shall be deemed to be acting only as a "transaction" agent or a "facilitator" where permitted, otherwise as the real estate agent of Mr. Cooper only.  In the event that, notwithstanding the foregoing, Xome is deemed to also be acting as a real estate agent on your behalf as a dual agent, then you and Mr. Cooper consent and agree as follows:

    a.  Inherent in dual agency (representing more than one party in a transaction) are the concepts that a dual agent must represent the interests of multiple parties, there will be limitations upon the representation provided to any particular party, there may be conflicts in and will be limitations upon the performance of any duties of loyalty, obedience, disclosure and confidentiality, and Xome shall have limitations upon any such duties owed to you or Mr. Cooper;

    b.  Xome may disclose known facts which materially and adversely affect the consideration to be paid by or to any party to the transaction;

    c.  Xome is authorized to at all times deal honestly with you and Mr. Cooper and to respond honestly to questions asked by you or Mr. Cooper with respect to the transaction; and

    d.  You and Mr. Cooper understand the necessary and essential consequences of dual agency and consent to any dual agency engaged in by Xome with respect to or arising out of this transaction.

15. By executing these Terms and Conditions, you warrant that (a) you are the owner of the property, (b) no other persons or entities have title to the property, (c) you have the authority to execute these Terms and Conditions, and (d) you have full authority to sell the property.

These Terms and Conditions shall be governed and construed in accordance with the laws of the State of Texas, without giving effect to any conflict of laws principles. Short Sale Validation Vendor is an express intended third-party beneficiary of, and shall have the right to enforce, each provision of these Terms and Conditions inuring to its benefit.



**Mr. Cooper's Short Sale Validation Program Terms and Conditions**

**After the Auction**
Once the auction is completed, your continued cooperation is necessary in order to accelerate the approval process.  If a higher offer is obtained through the Offer Validation Program:

- The winning bidder and the winning bidder's real estate agent (if applicable) will be contacted within 48 hours of the event completion to review the details of the winning bid and request the signed purchase contract from the winning bidder.
- Once the purchase contract is signed by the winning bidder, the purchase contract will be sent to you through your listing agent for your review and signature.  **We must have all documents completed, signed and returned within 48 hours of delivery to you.**
- Once the purchase contract has been fully executed by you and the winning bidder, it will be returned to Mr. Cooper for review and final approval. Please save a copy of the executed purchase contract for your records.
- If Mr. Cooper approves the purchase contract, the file will be transferred to the closing agent for closing.  Your listing agent, as well as the closing agent, will be your points of contact for the closing of the transaction.  They will assist you and answer any questions you may have regarding the closing process.

If a higher offer is not obtained through the Validation Program, Mr. Cooper will continue with the review of your existing offer.  Your listing agent should contact the Mr. Cooper representative for next steps.

It is extremely important to respond quickly to requests made by Mr. Cooper, and any auction-related requests made by Xome.  Your quick response and cooperation will help accelerate the processing of your short sale request.

*By signing below, I acknowledge that I have read, understand and accept Mr. Cooper's Short Sale Validation Program Terms and Conditions.*

| *«Borrower»:* | *«CoBorrower»:* |
| | *«CoBorrower»* |
| _____ | _____ |
| *SIGNATURE* | *SIGNATURE* |
| _____ | _____ |
| *PRINTED NAME* | *PRINTED NAME* |
| | |
| *Listing Broker/Agent:* | |
| _____ | |
| *SIGNATURE* | |
| _____ | |
| *PRINTED NAME* | |
| _____ | |
| *License Number* | |

**Please return the signed Terms and Conditions to Mr. Cooper within 10 days to your listing agent.**



**Hawaii Residents: If you believe a loss mitigation option request has been wrongly denied, you may file a complaint with the state division of financial institutions at 808-586-2820 or http://cca.hawaii.gov/dfi/.**

**New York Residents:** Nationstar Mortgage LLC d/b/a Mr. Cooper is licensed by the New York City Department of Consumer Affairs License Number: 1392003. **If you believe a Loss Mitigation request has been wrongly denied, you may file a complaint with the New York State Department of Financial Services at 1-800-342-3736 or www.dfs.ny.gov.**

**New York Residents Income Disclosure:** If a creditor or debt collector receives a money judgment against you in court, state and federal laws may prevent the following types of income from being taken to pay the debt: supplemental security income (SSI); social security; public assistance (welfare); spousal support, maintenance (alimony) or child support; unemployment benefits; disability benefits; workers' compensation benefits; public or private pensions; veterans' benefits; federal student loans, federal student grants, and federal work study funds; and ninety percent of your wages or salary earned in the last sixty days.

**Oregon Residents:** There are government agencies and nonprofit organizations that can give you information about foreclosure and help you decide what to do. For the name and telephone number of an organization near you, please call 211 or visit www.oregonhomeownersupport.gov. If you need help finding a lawyer, consult the Oregon State Bar's Lawyer Referral Service online at www.oregonstatebar.org or by calling 503-684-3763 (in the Portland metropolitan area) or toll-free elsewhere in Oregon at 800-452-7636. Free legal assistance may be available if you are very low income. For more information and a directory of legal aid programs, go to www.oregonlawhelp.org.

**North Carolina Residents:** Nationstar Mortgage LLC d/b/a Mr. Cooper is licensed by the North Carolina Commissioner of Banks, Mortgage Lender License L-103450. Nationstar Mortgage LLC d/b/a Mr. Cooper is also licensed by the North Carolina Department of Insurance, Permit Numbers 105369, 112715, 105368, 111828, 112953, and 112954. **If you believe a Loss Mitigation request has been wrongly denied, you may file a complaint with the North Carolina Office of the Commissioner of Banks website www.nccob.gov.**

**Texas Residents:** COMPLAINTS REGARDING THE SERVICING OF A MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 NORTH LAMAR, SUITE 201, AUSTIN TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT 877-276-5550. A complaint form and instructions may be downloaded and printed from the Department's website located at www.sml.texas.gov or obtained from the department upon request by mail at the address above, by telephone at its toll-free consumer hotline listed above, or by email at smlinfo@sml.texas.gov.